## THE NEW MARY HOUSTON.

### KINEON v. THE NEW MARY HOUSTON et al.

(District Court, S. D. Ohio, W. D. July 10, 1895.)

#### No. 1,723.

1. ADMIRALTY PLEADING—EVIDENCE—VARIANCE.

Proof, in a collision case, that the cables of a river steamboat which went adrift were not bent to her anchors, *held* proper to be considered, although the fact was not averred in the libel; it appearing that there was no surprise, and that the attention of counsel had in fact been called to the variance before the hearing.

2. COLLISION—DRIFTING STEAMER—NEGLIGENCE.

That the cables of a river steamboat moored to a wharf, which broke loose, went adrift, and collided with coal barges, were not bent to her anchors, *held* no proof of negligence.

3. SAME—DRIFTING STEAMER AND WHARF—NEGLIGENT MOORING.

Where a wharf and river steamboat moored thereto went adrift, and collided with coal barges, *held,* that the question of the steamer's liability was one of negligence in respect to the fastenings, and that such negligence would consist in a failure to adopt all precautions suggested by skill, experience, and careful, prudent, and intelligent forethought.

4. SAME—NEGLIGENCE OF MASTER.

Where a river steamboat went adrift on a dark night at a place where there was great danger of striking bridge piers, *held,* that it was not negligence or bad seamanship for the captain, before going on deck, to first see to extinguishing lamps and stoves, for the purpose of preventing the breaking out of fires in case of collision.

This was a libel in rem by Sol P. Kineon against the steamboat New Mary Houston to recover damages resulting from a collision.

William Worthington, for libelant.

Stephens, Lincoln & Smith, for respondents.

SAGE, District Judge. This is a libel for damages by collision which occurred about 2 o'clock in the morning of Saturday, January 16, 1892, on the Ohio river, at Cincinnati. The New Mary Houston was plying regularly between Cincinnati and New Orleans. She came up the river on the evening of Thursday, January 14th, and moored at the wharfboat of the Southern Wharfboat Company, her usual landing place at the Cincinnati public wharf between Broadway and Sycamore streets. After she was fastened to the wharfboat the fires were extinguished, the "wrist" from the "doctor" (an essential part of her operating machinery when in motion) was taken out for repairs, and she began to discharge her inbound cargo and to receive her outbound cargo. About 2 o'clock on Saturday morning the wharfboat broke loose from its moorings, and, together with the steamboat, drifted down stream. At the foot of Elm street, about half a mile below where the wharfboat was moored, a collision occurred with the coal fleet of the Pittsburgh Coal Com-

pany, resulting in the breaking loose of the barge C. Jutte No. 22, owned by the interveners C. Jutte & Co., and the loss of its cargo, consisting of 12,850 bushels of Youghiogheny lump coal, owned by the interveners, the Pittsburgh Coal Company. Whether this loss resulted from the collision of the barge with the steamboat, or with the wharfboat, is in dispute, upon the evidence; the interveners claiming that it was by collision with the steamboat, while the claimants of the steamboat contend that it was from collision with the wharfboat. Another collision, which occurred about half a mile down the river, at the foot of Smith street, between the wharfboat and the coal fleet of the libelant, Kineon, caused the loss of the Walton Barge No. 539, with its cargo of 13,461 bushels of coal, and the Advance Barge No. 35, with its cargo of 12,964 bushels of coal. The Walton barge was owned by the interveners Walton & Co.; the Advance barge, by the interveners the Advance Coal Company; the cargoes, by the libelant, Sol P. Kineon. Each coal fleet was moored securely to the shore of the river. The fleet of the Pittsburgh Coal Company consisted of eight barges, in tiers of four abreast. The outside barge of the upper tier was struck. Each barge was 25 feet wide by 120 feet in length. Between the barges and the shore were floats 20 feet wide. The distance between the water's edge and the outside of this fleet was about 125 feet. The barges of Kineon's fleet were in three tiers. The upper tier was five barges abreast; the middle tier, four barges abreast,—the outside barge being on a line with the outside barge of the upper tier; and the third tier consisted of but a single barge, which was strung behind the outside barges of the other tiers. The barges were 25 feet wide. Between them and the water's edge were floats 26 feet wide, and these were sparred out from the shore about 15 feet. The outer line of the barges was about 170 feet from the water's edge. The outside barge of the middle tier, and the sole one of the lower tier, were struck. The libel sets forth, among other things, that on the morning of the 16th of January, 1892, and for some little time prior thereto, the water in the Ohio river was, and had been, rapidly rising. The testimony is that when the Mary Houston was tied to the wharf there was considerable ice and drift in the river, and that it was rising fast. According to the statement of the superintendent of the waterworks, taken from the waterworks gauge, the river reached the following stages at the dates and hours named: January 15th, 6 a. m., 20 ft. 1 in.; 11 a. m., 23 ft. 7 in.; 5 p. m., 28 ft. January 16th, 6 a. m., 33 ft. 6 in.; 11 a. m., 35 ft. 4 in.; 5 p. m., 37 ft.

The libelants aver that, by reason of the rapid rising of the river, it became necessary, in the exercise of prudent and careful seamanship, for those in charge of the steamboat and wharfboat to use great care in fastening the wharfboat to the shore, and the steamboat to the wharfboat and the shore, and to other fixed and stationary objects, to prevent the steamboat and the wharfboat, or either of them, from breaking loose from their fastenings, or floating down stream.

They further aver that it was necessary, in the exercise of prudent seamanship, for those having the management of the steamboat to

keep up steam, so that if the steamboat should break loose from its fastenings its motion could be controlled and directed; also, that after the steamboat was moored to the wharfboat those in charge suffered the steam to go down, and the fires under the boilers of the steamboat to go out, and that the persons in charge of the wharfboat failed to use proper care in the fastening of the wharfboat to the shore, and the persons in charge of the steamboat failed to use proper care in fastening the steamboat to the wharfboat and to the shore, and to other fixed and stationary objects.

The libel then sets forth the breaking loose of the steamboat and wharfboat from their fastenings, their drifting, and the collision above referred to. It is charged that the collisions were occasioned by the negligence, inattention, and want of proper care and skill on part of the steamboat, her master and crew, and on the part of the wharfboat, her master and crew, and not from any fault, omission, or neglect on the part of the barges injured, or of any of the persons having charge or care thereof, or of either of them. The claims for damages are then set forth.

As to the stage of the river, and its rising, there is no conflict in the evidence. Nor is there any question that, when the steamboat and the wharfboat broke from their fastenings and went adrift, the steamboat was held by her fastenings to the wharfboat until they were parted by the shock of the collision with the Elm street fleet. This fact is sufficient evidence that the steamboat was securely moored to the wharfboat, especially as the testimony is that due care was exercised, and that all precautions usual and customary in such stage and condition of the river as is shown by the evidence were taken. The testimony is that it was customary and necessary to clean out the boilers on each trip, and for that purpose the fires were suffered to go down. The wrist of the doctor was at the same time taken out for repairs. It was proper to do this, in the exercise of due care of the machinery of the boat. There was nothing extraordinary in the stage of the river, nor in the rate of its rising. Under such conditions, driftwood, and, at that time of the year, floating ice, might have been expected. The evidence does not indicate that the ice was in such quantities as to endanger the safety of vessels, or to require that steam should be kept up.

Counsel for libelant relies upon the fact that the cables of the steamboat were not bent to the anchors. Counsel for the claimants objects that there is no averment in the libel of the fact, and cites The Marpesia, L. R. 4 P. C. 212, 213, etc. The court there held:

"If a plaintiff in a collision suit intends to rely upon a particular act of negligence by the defendant, he is bound specifically to allege that act in his pleadings; and it is not sufficient that the act may be included generally in an allegation in the pleadings which does not clearly state such particular act, as it is likely to mislead the defendant, and prevent his being prepared to meet that particular case."

That case was decided, and such was the rule, before the enactment of the judicature acts. The Ann, Lush. 55; The North American, Swab. 358; The Haswell, Browning & L. 247. See, also, The Hochung and The Lapwing, 7 App. Cas. 512. The rule has, however,

been so modified as now to apply only as far as its nonobservance has made it impossible for the respondent to meet the case brought by the libelant. The Alice and Rosita, L. R. 2 P. C. 214; Mars. Coll. 307. In this case there has been no surprise on this point. More than the usual time was devoted to the taking of testimony, and the variance in the evidence was brought to the notice of claimants long before the cause was brought to hearing. It cannot now be recognized as open to objection. But while prudent seamanship requires that the cables of a seagoing or lake vessel should be bent to the anchors, which may at any moment be required for use, and are often necessary for mooring purposes, on river steamers anchors are seldom brought into requisition. The river steamer is within easy reach of the shore, to which or to a wharfboat it is moored. The anchors are comparatively small and light. Those on the Mary Houston—so the captain testifies—were rated at 900 pounds, but actually weighed less. They were carried on the forecastle, and the lines were stowed under the barricades, as is usual on river steamers, so that their strength may be preserved. They can be quickly made fast to the anchors, as is evident from the fact that they were made fast, by order of the captain, before the first coal fleet was struck, and were cast after the steamer and the wharfboat were parted by the force of the collision. Besides, it may be doubted whether the anchors, although heavy enough to hold the steamer, would have been sufficient to hold both steamer and wharfboat. Whether so or not, that the cables were not bent to the anchors was not negligence.

The fastenings of the wharfboat are shown upon a diagram verified by the testimony of George E. Osborn, night watchman on that boat, and attached to his deposition. He testifies that, in addition to a head chain and a breast chain, he had out a line abreast, and two stern chains, all of the best material and made fast. The head chain was fastened by six or seven turns to two bitts on the port or shore side of the forward end of the wharfboat. These bitts were close together,—not two feet apart. That chain was to hold the wharfboat up; that is to say, to prevent it from moving down stream. The other end of the chain was fastened to one of the rings of a "deadman" (which is a heavy timber sunk in the ground some 15 or 20 feet), to which were permanently attached, by a chain, three iron rings, about a foot and a half in diameter. The testimony as to the thickness of the iron of the rings varies from one to three inches. Upon the principle that authorizes a judge at law to send a jury to inspect the premises, I proceeded to the spot, and, by inspection and measurement, found that the iron of the rings is two inches in diameter. There was also a breast chain which led, quartering from the capstan, near and outside the bitts on the forward end of the wharfboat, up the slope of the landing, and was there made fast to the ring of a "deadman." These and other deadmen were placed in the public wharf by the city to enable wharfboats and other craft to make their fastenings. On the wharfboat end of the breast chain was a frog hook, by means of which it could be made taut, the chain being too heavy to be pulled by hand. As

it was pulled in, it was given six or seven turns around the capstan, and fastened by the hook and an iron belt. Then there was a breast line,—an inch and a half cable,—which ran out to the bank, and was fastened there, having been made fast around a stanchion forward on the wharfboat. At the stern of the wharfboat there were two chains made fast to bitts on the boat, and to deadmen rings on the shore. These were tightened by the use of the capstan. The boat was made fast by tightening all the chains and the breast line about 11 o'clock p. m. of the 15th, which was about three hours before she went adrift. The testimony is overwhelming that the fastenings were ample, and that the chains and cable were properly placed and secured. Such fastenings had been found sufficient to hold the wharfboat through the floods of 1883 and 1884, and they had held it when four steamers were moored at one time to it. At another time they had held on a rising river the wharfboat and the Thomas Sherlock,—a much larger boat than the Mary Houston, and having on board 800 tons of freight, whereas the wharfboat and the Mary Houston together did not have over 300 tons of freight. The evidence of witness after witness—experienced river men, some. of them called for libelant—is that the fastenings were everything that skill and experience and prudent forethought could suggest, and that there was nothing lacking in care and attention on the part of those in charge of the boat. The head chain was one of the heaviest and strongest on the river. It was permanently attached to the ring of the deadman by means of a clevis. It was customary to use it when the ring was under water, and such use was in accordance with the general usage in such cases. It is suggested that some of the witnesses are interested, and that they are clannish, and biased by their employment in and relations to river navigation, and that, therefore, their testimony should be disregarded. But, since the law has almost everywhere reversed the old rule which made interest a disqualification, it will hardly do to discard testimony because it is given by interested witnesses. We can only look to their interest or bias that we may properly weigh and test their evidence. In this case the consensus of opinion, as expressed in regard to the fastenings, is so general as to carry conviction that it must be veritable and well founded. The only satisfactory conclusion that can be drawn from it is that there was no negligence or want of care in providing or arranging and securing fastenings to hold the wharfboat. But the claim for the libelant is that as the coal fleets were moored to the shore, and the steamboat and wharfboat were vessels in motion, the latter are liable for damages caused by collision with them, respectively, unless they can show that the collision resulted from inevitable accident; citing The Louisana, 3 Wall. 164, and quoting from Justice Grier's opinion, at page 173, that the Louisana, having drifted from her moorings, must be liable for the damages resulting from the consequent collision, unless she could show affirmatively that "the drifting was the result of inevitable accident, which human skill and precaution, and a proper display of nautical skill, could not have prevented." The case of The Baltic, 2 Ben. 452, Fed. Cas. No. 823, is also cited, where Judge

Blatchford quoted with approval the definition of "inevitable accident,"—that, as respects a colliding vessel, it means a collision notwithstanding such vessel has endeavored, by every means in her power, with due care and caution, and a proper display of nautical skill, to prevent it.

In The Grace Girdler, 7 Wall. 196, the supreme court said that "inevitable accident is where a vessel is pursuing a lawful avocation in a lawful manner, using the proper precautions against danger, and an accident occurs. The highest degree of caution that can be used is not required. It is enough that it is reasonable under the circumstances, such as is usual in similar cases, and has been found by long experience to be sufficient to answer the end in view,—safety of life and property." Dr. Lushington, in The Thomas Powell and The Cuba, 2 Marit. Law Cas. 344, says, "We are not to expect extraordinary skill or extraordinary diligence, but that degree of skill and that degree of diligence which is generally to be found in persons who discharge their duty." Mr. Marsden, in his work on Collisions at Sea (page 3), defines negligence as "the failure to exercise that skill, care, and nerve which are ordinarily found in competent seamen."

In The Olympia, 9 C. C. A. 393, 61 Fed. 120, the circuit court of appeals for the Sixth circuit said that by the expression "inevitable accident" was meant only "an occurrence which could not be avoided by that degree of prudence, foresight, care, and caution which the law requires of every one under the circumstances of the particular case. The rule in maritime law does not differ from that at common law, where there is no contractual relation between the parties." Negligence, which is, after all, the foundation of liability, consists, in such a case as this, in the failure to adopt all precautions and means suggested by skill, experience, and careful, prudent, and intelligent forethought. It is not to be ascertained or measured by applying afterthought, subsequent to the occurrence of the disaster, and suggested by reference to its incidents, unless it appear that the suggestions should have occurred prior to the disaster to those in charge. Although the watchman on the Mary Houston and two watchmen on the wharfboat were on duty at the time, neither they nor any other witnesses are able to state what caused the boats to go adrift. One of the watchmen on the wharfboat testifies that not more than five minutes before the accident occurred he had examined all the fastenings of the wharfboat, and found them secure. At 11 o'clock p. m. the wharfboat had been drawn in to the shore, and the fastenings tightened. Seven men were employed in that service. The river was rising rapidly. At 5 p. m. of January 15th, —seven hours before the accident,—the stage of water was 28 feet. At 6 a. m. of the 16th of January it was 33 feet and 6 inches. If the rise was steady, it was over five-thirteenths of a foot, or nearly five inches, per hour. It is attempted to be shown for the claimants that the wharfboat and steamer were broken from their moorings by the steamer being struck by a floating raft or by floating logs. It is shown that some damage had been done up at the waterworks, some half mile above, by floating logs. It does not appear that any

raft had broken away at any point above, or was seen drifting in the river.    It is shown that the starboard wheel of the Mary Houston was damaged, probably by floating logs, and that quite a number of logs were found under her hull, as she lay at the Kentucky shore, the day after the accident.    The evidence is, as is remarked by counsel for the libelant, altogether too inconclusive to support the theory that they, or that a drifting raft, struck the steamer and tore her and the wharfboat from their moorings.    That such a collision could have occurred without breaking through, or at least seriously damaging, the hull of the steamboat is incredible.    Besides, the Houston was 280 feet long, and the wharfboat some 300 feet long and from 20 to 40 feet wide,—a heavy unwieldy, flat-bottomed craft. There were not more than 300 tons of freight on the steamboat and on the wharfboat, and it is not to be believed that any blow against the hull of the steamer which would have been sufficient to suddenly force the wharfboat against the landing, and cause it to surge back and break its fastenings, could have struck without crushing through, or at least seriously damaging, the hull of the steamer, and the hull of the steamer was not broken or damaged.

Now, let us look into the facts as they appear in evidence, and see if it is possible to arrive at an intelligent and at least probable explanation of the breaking away of the wharfboat from its moorings. The head chain, which, as has been already stated, was one of the heaviest on the river, was fastened to the wharfboat at the forward end, and near the port or shore side.    It was attached at the other end by a clevis to the outer one of three links of a deadman, which, it is in testimony, would be under water at an 18-feet stage of the river.    It had been under water three or four days.    It was taut, and made fast to the wharfboat by six or seven turns around the bitts.    Then there was a breast chain fastened also at the forward end of the wharfboat, around the capstan, and leading quartering up the bank, to where it was fastened to the ring of a deadman. Next a breast line, a cable an inch and a half in diameter, and leading from a little further back on the wharfboat directly, or at right angles with the boat, up the bank, to where it was fastened to a deadman.    At the stern were two chains firmly fastened to the boat and to the links of deadmen at right angles with the boat on the shore.    These fastenings held the boat so tightly that it could not move either up or down the river.    As the river rose the tendency of the boat, by its buoyancy, was to rise with it; but the head chain, which being under water, was holding it down, and at the same time holding it from moving down stream,—that is to say, was pulling against the lifting power of the buoyancy of the boat, and preventing its rising with the water.    The only possible relief against the tension thus resulting would be by easing the breast and stern fastenings so as to allow the boat to move up stream, and so ease the head chain.    But those fastenings were so strong, and made so taut and secure, that it could not so move.    The rings of the deadman to which the chain was attached were about a foot in diameter, and composed of iron two inches in diameter.    The tensile strength of wrought iron is from 20 to 40 tons per square inch, according to the

quality of the iron. The testimony is that the iron of the rings was of the best quality. Against this tensile strength was being constantly exerted the force of the current upon the wharfboat and the steamer, and the continually increasing force resulting from the fact that the chain was holding the boat down in the water, and preventing its rising with the river,—in other words, against a force constantly increasing by reason of the buoyancy of the boat and the rapid rising of the river. That force would be measured by the amount of tonnage which would be required to sink the boat in the water as low as the chain held it. The great force of the strain would come upon the link; for, as to the clevis and the chain, it would be distributed, while, as to the link, its diameter of a foot gave a leverage to the pull which would make the link the first thing to give way.

I have carefully considered the evidence, and am satisfied that right here is the solution of the mystery of the accident. Whenever the combined force of the current against the wharfboat and the steamer, and of the down pulling of the chain against the uplifting power of the water upon the wharfboat, would exceed the tensile strength of the iron of the ring, the ring would break; and that, in my opinion, is what happened. The watchman on the steamer says that just as the wharfboat broke away there was a shock against the whole side of the Mary Houston, which was like a heavy blow reaching from one end of the boat to the other. It first struck the steamer aft, about the wheel house, and then, immediately, it was felt all along the side of the steamer. Upon which side the blow fell, he does not state. One of the watchmen on the wharfboat testifies that less than five minutes before the wharfboat broke away from its moorings he examined the lines, found them to be secure and taut, when suddenly there was a noise like a shot from a cannon, and then he saw the breast chain running out from the capstan, round which six or seven turns had been made, and at the same time he discovered that they were adrift. That sound, as of a shot from a cannon, can be best explained by supposing that just then the tensile strength of the iron of the ring was overcome, and the ring snapped. It could hardly have come from the breaking of the ring, for the water was deep enough to muffle the sound. It may have come from the sudden loosing of the head chain, or from the surging of the wharfboat against the steamer. It is in evidence that the head chain was not broken, and that, while no broken link was found, one of the three links of the deadman was missing. The immediate result of the breaking of the link would be that the wharfboat would surge up, and, as the chain was fastened near the port or shore side of the forward end of the wharfboat, the holding down of that part would tend to lift correspondingly the stern of the wharfboat on its starboard side. When the link gave way, and the boat surged, the blow would instantly come against the part of the steamer where the witnesses say it did come,—at about the wheel house. It is also in evidence that if the head line were suddenly broken, or suddenly let loose, and the wharfboat surged, the sudden jerk would break her loose from all the other fastenings,

which would be insufficient to hold her. This solution of the casting adrift of the wharfboat seems to be the only one to which all the circumstances detailed in evidence can be made to fit. The fact appears to be, not that there were not enough fastenings to hold the wharfboat, but rather that there were more than enough. It may have been a disaster resulting from overcare,—from excessive precaution. Had the fastenings been stronger or more secure, the disaster might been delayed, but not averted; for the force or power which caused it was constantly and rapidly increasing, and bringing the strain to a point where something must give way. Possibly, if there had been no stern chains, which, according to the evidence of witnesses, are used to prevent a boat from moving up the river, the wharfboat would have moved up, and eased the head chain, which might have prevented the accident. However this may be, no expert—not a single witness, either for the libelant or for the claimants—has referred to the theory of the case here suggested, nor does it seem to have occurred to any of them, nor to counsel. If the theory be correct, it is a forcible illustration of afterthought, not chargeable to forethought, nor furnishing the standard of responsibility by which to measure the conduct of those in charge of the wharfboat. The only suggestion made anywhere in the case with reference to the submergence of the head chain was by counsel for libelant,—that as the boat was drawn further up the wharf the tendency of the chain would be more and more to pull its head out into the stream. As to that, the uncontradicted testimony is that the head chain was permanently attached to the ring of the deadman, to which it was attached that night. Upon the evidence, it seems to be reasonably certain that the shore fastenings were strong enough and secure enough to hold the wharfboat against the outpulling force, if there was an out-pulling force, or against any other force excepting a sudden jerk caused by the surging or lurching of the wharfboat.

Bad seamanship is charged against the captain of the New Mary Houston, on the ground that it appears from his own deposition that when roused from sleep, at the time of the accident, instead of staying on deck, giving orders, and taking measures that would lead to the stoppage of the drifting boats, he went into the cabin, and looked after the fires, occupying himself there until after the collision had occurred at the foot of Elm street, and that only then did he concern himself to go on deck and order the anchors overboard. Counsel for libelant submits that, in time of danger and peril such as that, the place for the captain was not in looking after stoves and lamps, but to the navigation of his vessel. The captain's explanation of his conduct is that the whole thing came upon him suddenly and unexpectedly, and that his first thought was to extinguish the lamps and see to the stoves, so that, if they should strike a pier of the bridge, which was the danger he feared, the steamer would not take fire, and a loss of life ensue. Everybody knows that the river steamers are as inflammable as tinder, and this was the danger that, when confronted with the emergency, presented itself to the captain's mind. In Marsden on Collisions at Sea (page 4), it is laid

down as the law that in all cases of sudden and great danger, not caused by a man's own negligence, he is required to exhibit ordinary presence of mind and ordinary skill, "but it is manifest that in such a case he may do, or omit to do, something which may contribute to the collision, without thereby showing himself deficient in ordinary skill, care, or nerve." Such an act of omission is held not to be negligence. In support of this statement of the law, the author cites The Sisters, 1 Prob. Div. 117; The Jesmond and The Earl of Elgin, L. R. 4 P. C. 1, 7; The Marpesia, Id. 212; Vennall v. Garner, 1 Cromp. & M. 21; The City of Antwerp and The Friedrich, Inman v. Reck, L. R. 2 P. C. 25,—and illustrates the principle by a statement of other cases. That rule applies in this case. The captain was below but a short time,—not longer than was necessary for the purpose he had in view. When he came on deck he at once gave the order to fasten the cables to the anchors. The night was foggy, and pitch dark. They could not see where they were, nor where they were going. They had been cast adrift in the night, suddenly, without their fault, and the captain was doing the best he could under the circumstances. He was not guilty of bad seamanship, or of negligence. Upon the whole case, and even if the theory above advanced be wholly untenable, the conclusion of the court is that the casting adrift of the steamer and the wharfboat was by a vis major, that the collisions resulted from inevitable accident, and that the decree should be against the libelant and the interveners, with costs; and it is so ordered.