## THE OLYMPIA.

### WEEKS et al. v. WILSON TRANSIT CO.

(Circuit Court of Appeals, Sixth Circuit. February 19, 1894.)

#### No. 109.

1. COLLISION—INEVITABLE ACCIDENT—BREAKING OF TILLER ROPE—BURDEN OF PROOF.

When a collision results from the breaking of a steamer's tiller rope, the burden is upon her to rebut the presumption of negligence, either by showing the cause which broke the rope, and that the result of that cause was inevitable, or by showing all the possible causes which might have produced the break, and then showing that the result of each one of them could not have been avoided.

2. SAME—EVIDENCE.

A collision having resulted from the breaking of a steamer's tiller rope, it was shown in her behalf that the rope was of charcoal iron wire, of suitable size, of the usual kind, and externally sound; and that it had been bought of a reputable outfitter, and used less than two seasons, while the minimum life of such a rope is about three years; and that it had been inspected a few hours before the accident. Witnesses who saw the broken ends of the wires testified that there were no indications of defects. The steering gear was worked by steam engines capable of putting severe strain on the rope, but the evidence showed that the wheel was not suddenly handled. Held, that the collision was due to inevitable accident, and not to the steamer's fault. 52 Fed. 985, affirmed.

Appeal from the District Court of the United States for the Eastern District of Michigan.

This was a libel by Charles H. Weeks and others against the steamer Olympia, of which the Wilson Transit Company is claimant, to recover damages for a collision. The court below dismissed the libel (52 Fed. 985), and the libelants appeal.

This is a case of collision between the schooner John Sherman and the steamer Olympia. It occurred about 4 p. m., May 8, 1891, on Detroit river. The day was bright, and there was neither wind nor sea. The Olympia was bound up the river, and was on the American side, when the colliding vessels came in sight. The Sherman was bound down the river, in tow of the steamer Lovell. Astern of the Sherman, and in the same tow, was the schooner Roberts. The Lovell and her tow were on the Canadian side of the channel. The river at point of collision was one-half mile in width. The Olympia, when nearly abreast of the Lovell, was headed to pass under the stern of the Roberts, and well off the starboard side of the Sherman. The second article of the libel avers: "That said propellers were on courses that would have carried them a considerable distance apart, and that no accident would have occurred had the propeller Olympia kept on her course, as it was her duty to have done, and that the said propeller Olympia, instead of keeping her course, departed therefrom, and turned to starboard, and towards the propeller Lovell and her tow, and came on with great speed, and without properly stopping and backing, or making any other effort to avoid the collision which ensued, struck the said schooner Sherman upon her starboard side, crushing in her side, rail and planking, and so breaking and injuring said schooner as to render her a total wreck. That said collision occurred in broad daylight, and that it was impossible for said schooner to avoid or get out of the way of the said Olympia." Among other things, the answer of the claimants states: "That when opposite the lower end of the Detroit the Olympia checked down, and drew in toward the American dock for the purpose of being met by the reporter's boat, which came out to her nearly opposite Woodward avenue, in said city. That the Lovell was coming down the river near mid-channel with the Sherman and another barge in tow. That, after dismissing the reporter's boat, the Olympia ported slightly, to go under the stern of the tow, and get out into mid-channel, and the course past the Belle Isle, and gave the all-right signal to her engine for the usual full speed. She started to swing, and was swinging slowly to starboard, when the order to steady was given, the Olympia then heading astern of the tow, and all clear of them, and the wheelman turned the wheel, and attempted to starboard the helm, in order to stop her swing and steady the steamer, when it was found that the helm could not be starboarded; whereupon, instantly, the reversing signal was given, and her engine was promptly reversed and backed, with all its power, and an alarm whistle was blown to the tow. That the Sherman could and might have been sheered with her helm over to her port far enough to entirely avoid the collision, without letting go of her towline, but respondent says that no one on board the Sherman paid any heed to the warning signal. That no effort was made on her either to shift her course, or to let go the towline, but she continued to go on, passing the starboard bow of the Olympia, which had been thrown some to starboard by the reversing of her propeller wheel, so that the starboard bow of the Olympia came glancing against the starboard quarter of the Sherman, the headway of the Olympia being by that time nearly, if not quite, stopped. That, owing to the manner of their coming together, as aforesaid, and the angle of contact, the force of the collision was not great or severe, and would not and could not have materially injured a seaworthy vessel, or one of ordinary soundness and strength, and did not in any manner or to any extent injure the Olympia. That the cause of the steering gear failing to work was ascertained to be the breaking of the wire wheel rope aft on the starboard side. That it was a wire rope of suitable and ample size, which had been bought at a price which should have insured the best material for that purpose, and was properly rigged and fitted in the most approved manner. That it had been overhauled at Cleveland the day previous to this collision; and her steering gear had been put, so far as human knowledge and ingenuity could do so, in perfect condition; and that, according to the standing rule in said steamer, the mate had looked over and examined the steering gear, including this rope, before the vessel entered Detroit river, but a few hours before the accident, on which occasion he had apparently found everything in good order and condition. Respondent avers that the breaking of said wheel rope, and the consequent inability to steady the ves-

sel, was due to no fault, negligence, or omission on the part of this respondent, or the officers and crew of said steamer, but the same was due to, and was caused by, unavoidable accident, which could not be foreseen, and against which human prudence could not guard." The cause was submitted to the district judge, who sustained the defense of inevitable accident, and dismissed the libel, each party paying its own costs.

F. H. Canfield, for appellants.
· H. D. Goulder, for appellee.

Before TAFT and LURTON, Circuit Judges, and RICKS, District Judge.

LURTON, Circuit Judge (after stating the facts as above). We quite agree with the district judge "that the proof acquits both the Sherman and the Olympia of the omission of any measure which would have averted or mitigated the collision after the breaking of the latter's wheel rope." The collision being, on the clear weight of the evidence, inevitable, after the Olympia's tiller rope broke, the judgment must depend upon her responsibility for that mishap. Was that the result of inevitable or unavoidable accident? The case must turn upon the answer. The maritime law is well settled that when a collision occurs through inevitable accident the loss must be borne by the party upon whom it happened to fall. Pars. Ship. & Adm. 525. No one is responsible if the accident was inevitable. The Morning Light, 2 Wall. 556; Marsd. Coll. 11. The circumstances alleged in the libel are so far admitted in the answer as to make out a prima facie case of negligence on the part of the Olympia. Her sudden change of course was the immediate cause of the collision. Prima facie that change, of course, was a violation of very plain rules of navigation, and the burden is upon the claimants to explain. The defendants say, "Our tiller rope broke, and the vessel became unmanageable, and the collision unavoidable." That only shows that the breaking of the tiller rope was the cause of the collision. They must go further, and show that the cause which operated to break the tiller rope was unavoidable. The collision was but the result of the cause which produced a broken tiller rope. If that cause is not shown to be unavoidable, how can it be said that the collision was an inevitable accident? Unless the defendants can get rid of the negligence proved against them by showing the cause which broke this wheel rope, and that the result of that cause was inevitable; or by showing all the possible causes which might have produced such an effect, and then showing that the result of each one of these possible causes could not have been avoided by them, they have not met the burden of proof which rests upon them. This is the doctrine of the late case of The Merchant Prince, decided in 1892 by the court of appeal, and reported in the Law Reports, Probate Division, 179. The case was in many respects like the one at bar. The libelants' vessel was at anchor in the river Mersey. The Merchant Prince came down the river by daylight, and in passing the vessel at anchor became unmanageable. A collision ensued. The defense was that the steam

steering gear of the defendants' vessel failed to act in consequence of some latent defect which could not have been prevented by due care. Fry, L. J., said:

"The defendants had failed to sustain the plea of inevitable accident, as it was necessary for them either to show what was the cause of the accident, and that, though exercising ordinary care, caution, and nautical skill, the result of that cause was unavoidable, or to enumerate all the possible causes, one or the other of which might have produced the effect, and show with regard to every one that the result was unavoidable."

The fullest and leading opinion was by Lord Esher, M. R. Among other things, he said:

"Unless you can get rid of it, it is negligence proved against you that you have run into a ship at anchor. * * * He can only get rid of that proof against him by showing inevitable accident; that is, by showing that the cause of the collision was a cause not produced by him, but a cause the result of which he could not avoid. * * * If he cannot tell you what the cause is, how can he tell you that the cause was one the result of which he could not avoid?"

The opinion proceeds by discussing the evidence, which showed that defendants had a new chain, that a new chain was very liable to stretch and become loose on the leading wheel; that a loose chain was liable to kink, and that the kinking of the wheel chain was the probable cause of the sudden and momentary refusal of the wheel to turn. This was a thing which the court thought ought to have been foreseen and provided against. Lord Esher concludes his opinion by saying:

"It seems to me in this case, from what one can see of the facts proved of the conduct of the ship here, to show a probable cause, and if that was the cause it could have been avoided. Here the defendants either have not shown any cause, and then they cannot have shown a cause the result of which was one that they could not avoid, or they have shown a probable cause, which, if it was the real cause, which seems most likely, was one, the effects of which they could have avoided."

This was, in substance, the principle upon which the learned district judge relied in disposing of this case. He said:

"Every practical precaution seems to have been taken to forefend this casualty. Its occurrence may with equal reason be referred to a sudden and extraordinary strain, which is the theory of masters of experience, or to a latent undiscovered defect in the rope, or the co-operation of both these causes. Whether occasioned by either or both, it was inevitable."

The Olympia was comparatively new, having been run less than two seasons at the time of this disaster. She had a steam steering gear of the most approved pattern, and her tiller rope was of charcoal iron wire, an inch in diameter. She was also provided with relieving tackles, adjustable in from three to five minutes. Her steam steering gear was worked by double steering engines of seven horse power, geared to a screw worm. Many witnesses have testified as to the sufficiency of her steering gear, the manner of its adjustment, and the competency of her officers and crew. Many experts in machinery and navigation have likewise testified as to the sufficiency of her wire tiller rope and as to the probable cause of its giving way. Does all this evidence show the cause which pro-

duced the effect? If not, we must then look to all the possible causes to which such an effect may be attributed, and determine whether, in respect to the proven cause or the possible cause, the defendants have further shown that, if the effect be attributed to a known or a possible cause, it was equally unavoidable by that degree of foresight and care imposed upon them by law. From the whole body of the proof we may enumerate the possible causes to which may be attributed the breaking of the Olympia's wheel rope: (1) Patent defects in the rope, due to original unfitness or resulting from use; (2) mismanagement of the steering engine; (3) extraordinary strain, due to unexplained caprice of steam without negligence, or produced by the rudder striking an obstruction; (4) latent defects due to negligence of manufacturer, or to use, and not discoverable by such an examination and test as was possible for defendants to make.

1. There were no patent defects in the rope. In diameter it was, on all the proof, such as experience had shown ample for a vessel such as the Olympia. The material was charcoal iron wire, and it was such a rope as was commonly in use for such purposes. Externally it was a sound rope, thoroughly adapted to the use to which it was put. Neither had use developed any patent defects. It had been in use less than two seasons. The minimum life of such a rope is, on the evidence, about three years. It had broken the year before, and as a result she ran aground on Boston shoals. Prima facie this would condemn the rope, and make its subsequent use an act of negligence. But the evidence thoroughly demonstrates that that break was not due to defect in the rope. It occurred at the forward sheave abreast the pilot house. The block through which this rope ran became warped from contact with a steam pipe. The block being thrown out of its horizontal position, thereby caused the tiller rope, under the power of the steering engine, to be brought against the pin of the sheave. This caused such chafing as to part one strand of the rope, and cause a jam, which stopped the wheel from drawing the rope. This chafed part of the rope was cut out, and a short splice put in. The rope was changed end for end, so as to throw this splice on the barrel of the wheel. The warped block was removed. The splicing which took place at Cleveland the night before the accident has no possible connection with the parting in question. The night before, and just before leaving Cleveland, the master, "for the purpose of bringing into a horizontal position the block next to the quadrant on the rudder post, caused a short splice to be inserted in the tiller rope between that block and the block on the starboard quarter." "With the wheel hard over, the forward end of this splice was brought within a foot of the starboard block aft, no part of the splice traveling on the sheave." The parting now under consideration did not in any way involve this splicing, for the rope parted at a point where it had not been spliced, and between the last splice and the starboard quarter block. Thus neither of the splicings mentioned were due to any known defect in the rope, and there is no causal connection

between the splices and this parting. The splicing done at Cleveland the night before involved such handling of the rope by the rigger who made it, and the mate and others who assisted, as to enable them to say that the rope at the place where it parted the next day presented no appearance of a defect. The rope was presented in court at the hearing, and examined by experts, who testified that it was apparently sound, smooth, pliable, and of good quality. The evidence of those who saw the rope after the accident was that the break extended for some four feet, and presented the appearance of having been pulled apart. The wires in the ends were fagged and of uneven length. These witnesses were not mechanical experts, but they say that the fagged ends presented no indications of defect. Some comment has been made by counsel that the rope has not been presented in court in its original condition. The piece presented shows that the fag ends had apparently been broken or chopped off. This is probably due to the fact that the fag ends were broken or chopped off by some person carelessly, or with a purpose to conceal defects. When it parted, the broken rope was taken out, and suffered to lie among other worthless articles. A sailor was seen on one occasion to be engaged in pulling out some wires to make fender ropes. He was stopped, and the mate ordered to put it away and keep it. That mate died, and the rope was lost sight of, a part only being found pending the trial, coiled up in a barrel in the hold of the ship. So many witnesses speak positively as to the appearance of the fag ends, now gone, that we can see no motive moving defendants to destroy evidence, and we are disposed to believe that at most they have not been duly mindful of the propriety of preserving the broken rope intact. The rule on the Olympia regarding inspection of the steering gear was that it should be examined before entering rivers or ports, and the evidence is that such examinations were ordinarily made. Two or three hours before this collision, the Olympia had entered the Detroit river, coming off Lake Erie. The master testified that the mate, who died before this suit was brought, was sent by him to make this investigation. In obedience he went, and returned in a few moments, reporting. "All right." Our conclusion is that this rope was in an apparently sound and serviceable condition at the time it parted.

2. Was it due to mismanagement of the steering wheel? The full force of the power of the steering engines suddenly thrown upon the steering gear might produce such a sudden strain as to snap the wheel rope. This full force could only be exerted by very suddenly putting the steering wheel hard over. If there was no necessity for putting the wheel hard over suddenly instead of slowly, and a parting was the result, negligence might well be imputed. But the evidence rebuts the theory that this was the probable cause. The evidence of the wheelman does not show that the wheel was put hard over, or suddenly handled in any way. The expert evidence is that, if broken by a strain due to the power of the steering engines, the greatest force would have been exerted forward, and not aft, where this break occurred.

3. If the break was due to a strain from the steering engine, then the effect was not the result of any negligence in managing that engine, but was attributable to an uncontrollable caprice of steam or an inherent weakness in the rope. In either event, the accident was unavoidable. A severe strain would be produced on the rope by the contact of the rudder with an obstruction; such as a submerged log. In that case the greatest strain would be aft, just where this parting occurred. There is no evidence whatever tending to show that such a blow was received by the rudder. While a possible cause, it was not the probable cause. Regarded as a possible cause, the defendants would be guilty of no fault in that respect, for the obstruction was a hidden one, against which no precaution would have availed.

4. Was it due to any latent defect in the rope? There is no affirmative proof' that there was such a defect. But if, by exclusion, we have ascertained that it was due to no other possible cause, we must conclude this to be the probable cause. Under such circumstances the doctrine "res ipsa loquitur" would have application. Whether this defect was due to the fault of the manufacturer or was the result of use, the defendants would not be in fault, unless it was of such a character as that by such examination as was in their power to make it could have been disclosed. The rope was, when bought, such as a prudent and cautious owner might safely put in his vessel. No test, save that of the hand and eye, was possible. It was bought, as the best of its kind, from reputable outfitters. The manufacturer is undisclosed. We do not think this important. The article was such as was adapted to the purpose for which it was used, and was such as was customarily used by prudent men engaged in the same business. The owners of vessels are not, as to strangers, under any liability as warrantors of the sufficiency and soundness of machinery or equipment. They are bound to use that degree of care in the selection of machinery and equipments which persons of ordinary prudence are accustomed to use and employ for the same purpose.

In the case of The Lizzie Frank, reported in 31 Fed. 477, the rule was stated thus:

"When a vessel is constructed and equipped in the mode usual and customary with other vessels of like character, and in a mode approved by competent judges and previous experience, then, in case of an accident happening by reason of a latent defect in the equipment and construction, there is no negligence on the part of the owner."

In the case of The Flowergate, 31 Fed. 762, it was held that:

"The use of an eye bolt, apparently sufficient for the purpose for which it was employed, but in reality insufficient, solely because of a latent defect, entails no liability for a personal injury caused by such a defect."

See, also, The Litania, 19 Fed. 101; Marsd. Coll. 11–24. At page 33, Mr. Marsden sums up the rule thus:

"A ship is not one of those things dangerous in themselves, which entails upon their owners the responsibility of insuring safety, but the law casts upon the shipowner the duty of using reasonable care to insure that his ship when she sails, and while she is under way, is in a condition in which she

may be navigated with safety to other ships. If she damages another ship in consequence of the giving away or inefficiency of her gear or equipment, a prima facie case of negligence arises. The presumption of negligence may, however, be rebutted by showing that the defect was latent, that reasonable care was in fact used to put and keep her in good condition, or that the giving way of the gear was due to stress of weather, or other unavoidable cause."

In the case of The Grace Girdler the question of what would be an inevitable accident was considered, and the rule of diligence defined in these words:

"The highest degree of caution that can be used is not required. It is enough that it is reasonable under the circumstances, such as is usual in similar cases, and has been found by long experience to be sufficient to answer the end in view,—the safety of life and property." 7 Wall. 196.

This states the measure of care applicable to the navigation of a ship, and we think is equally applicable to the equipment of a vessel and the use and care of that equipment. It was the rule which met the approval of the learned district judge, and fully meets our approval. Upon the whole body of the proof, we find ourselves unable, as was the district judge, to say that we are convinced that the effect was due to any one of the possible causes suggested by the evidence, or in argument. It was probably due to one or both the causes suggested by the opinion of the district court. If it was attributable to a sudden strain (about which we have much doubt), that strain was an effect consequent upon a careful and proper use of the power of the steering engine, and is ascribable to some undefinable law of steam known only by capricious manifestations. If due to an inherent and latent defect in the rope (as we think more probable), then the defendants were not in fault, for it was such a defect as was only discoverable by taking the rope to pieces, and subjecting it to expert examination. If defendants have shown, with respect to each possible cause, that the effect could not have been avoided by the use of care, caution, and skill, then the effect was in law unavoidable, and the collision, in legal phraseology, inevitable.

It is not meant by the expression "inevitable accident" one which it was physically impossible, from the nature of things, for the defendant to have prevented. We only mean that it was an occurrence which could not be avoided by that degree of prudence, foresight, care, and caution which the law requires of every one under the circumstances of the particular case. The rule in maritime law does not differ from that at common law, where there is no contractual relations between the parties. The able proctor who has appeared for libelants has himself defined an inevitable accident as an occurrence which could not possibly be prevented "by exercise of care, caution, and maritime skill." Marsd. Coll. 8–11; The Michigan, 52 Fed. 507. In the case of The Morning Light (a collision case) the court said that "inevitable accident may be regarded as an occurrence which the party charged with the collision could not possibly prevent by the exercise of ordinary care, caution, and nautical skill." 2 Wall. 560, 561. The common-law definition is

substantially the same. An accident is said to be inevitable when it is not occasioned in any degree, either remotely or directly, by the want of such care and skill as the law holds every man bound to exercise. Dygert v. Bradley, 8 Wend. 473. A distinction exists between the liability of one in contractual relations to another as to the soundness and safety of machinery or appliances, as in the case of carrier and passenger, and the liability to a stranger. That distinction is recognized and stated in the Nitro-Glycerine Case, 15 Wall. 537, 538, and Railroad Co. v. Elliott, 149 U. S. 271, 13 Sup. Ct. 837. In the Nitro-Glycerine Case, the court held that a steamship company was not liable for damages resulting from the explosion of nitrogylcerin while in its possession as a carrier. It held that the accident, under the circumstances, was unavoidable, and that the consequence of all such accidents must be borne by the sufferer as his misfortune. In discussing the circumstances under which an accident might be regarded as inevitable, and therefore to be borne by the person upon whom its consequences fall, the court said:

"This principle is recognized and affirmed in a great variety of cases,—in cases where fire originating in one man's building has extended to and destroyed the property of others; in cases where injuries have been caused by fire ignited by sparks from steamboats or locomotives, or caused by horses running away, or by blasting rocks, and in numerous other cases which will readily occur to every one."

Proceeding, the court said:

"The rule deducible from them is that the measure of care against accident which one must take to avoid responsibility is that which a person of ordinary prudence and caution would use if his own interests were to be affected, and the whole risk were his own. And the principle is not changed whether the injury complained of follows directly or remotely from the act or conduct of the party." 15 Wall. 538.

Tried by this rule, we think, on the evidence, that no sufficient error is shown to justify a reversal of the district court. Whether the effect was due to one or the other of the possible causes suggested on the record, it is sufficiently shown that the effect could not have been prevented by that degree of foresight, care, and caution required by law. The decree must be, therefore, affirmed.