---

## THE ACME.

### (District Court, W. D. New York. February 26, 1903.)

### No. 145.

1. TUG AND TOW—LIABILITY FOR GROUNDING OF TOW—DERANGEMENT OF TILLER.

To exonerate a tug from liability for the loss of a tow by grounding, resulting from a derangement of the tug's steering gear which rendered her unmanageable, it is not enough to show that the defect was not due to her fault but to inevitable accident, but she must further show that thereafter the injury of the tow could not have been prevented by the exercise of ordinary care and skill; and such care and skill are not shown where it appears that the trouble arose from the loosening of a pin which held the tiller, which could have been discovered and fastened in time to have prevented the grounding, but that no examination was made until afterward, and nothing done except to reverse the engine.

2. SAME—DEFENSES—ACTION IN EXTREMIS.

The failure of a tug's steering apparatus to work, leaving her headed toward an island in the river, which she struck, grounding her tow in about five minutes afterward, did not present such a condition of immediate danger as to excuse the failure of the master to make any attempt to discover and remedy the defect, on the ground that he acted in extremis.

In Admiralty. Suit to recover for sinking of tow.

Carpenter, Park & Symmers and George S. Potter, for libelants.
Peter S. Carter and George Clinton, for claimant.

HAZEL, District Judge. The libel has been filed in this cause to recover damages sustained by the canal boat George Chambers while in tow of the steam canal boat Acme.

It appears from the evidence that on the 29th day of October, 1902, while the Acme with tow was proceeding down the Hudson river just below Coxsackie Island Light, at about 6:30 o'clock p. m., a mishap occurred which resulted in the sinking of the Chambers. The tow consisted of four canal boats, heavily laden with grain, and arranged in an apparently safe and proper manner. The Chambers was forward, with the canal boat Hudson astern on the starboard side of the Acme, which had another canal boat ahead, and one on her port side. The fleet thus made up proceeded down to a point below Coxsackie Light. A bend in the river required the course to be altered to port towards the westerly side of the river. The Acme seasonably attempted to starboard her helm, which, however, for some then unknown cause, had fouled and would not move. The helm, in charge of a seaman, was immediately surrendered to the master of the Acme, who was present in the pilot house, and had directed starboarding the helm. The master vainly tried to execute the required maneuver, and, failing to move the helm to starboard, instantly signaled the engineer to reverse the Acme's engine full speed. The engineer obeyed the signal. Nevertheless, the tow proceeded ahead in a straight course, which resulted in contact with an island and grounding the Chambers. The speed of the tow, at the time of the starboard order, was five miles an hour with an ebb tide. The master of the Acme testified that, when he discovered that his wheel would not turn to starboard, his boat was 1,500 to 2,000 feet distant from the point where the Chambers struck. This testimony would appear to be corroborated by the chart in evidence. The impact occurred between four and five minutes after the attempt to starboard the Acme's helm. According to the view of the libelant, the Acme was remiss in seasonably starboarding; that, at the time the master of the Acme testifies he attempted to execute the maneuver, his helm had already been turned hard astarboard. This theory is based upon the testimony of Timans, an expert witness for libelant, who testified that in his judgment the Acme and tow, assuming that she had lost her steering capacity at the point indicated by the master of the Acme, and where a strong current divides the river, would have drifted down westerly through Coxsackie Channel. It is further contended by libelant that, assuming the attempt to starboard the Acme's helm to have been seasonably made, she nevertheless is in fault through failure of her master to make or cause to be made an immediate inspection of her steering apparatus, which would have disclosed the derangement of her rudder. Such an inspection would not only have revealed the impairment of the helm, which fouled the sheave, but would have enabled instant repair, and consequent prevention of the casualty. The proofs do not justify an assumption of fault in the management of the Acme owing to a belated attempt to starboard her helm. In the view which I take of this controversy, the primary question is whether the master of the Acme exercised that reasonable care imposed upon him by the maritime law to prevent the accident, which was imminent when the obstruction of the maneuver under starboard helm became apparent.

According to the claimant, the accident is entirely attributable to the derangement of the key or wedge which held the tiller in position, causing the tiller head to drop and foul the sheave. This resulted in the failure of the steering gear to perform its function. The key and steering apparatus were inspected at Troy, just before entering the river. What loosened the key does not clearly appear. A westerly wind, however, caused a heavy swell, and it may be considered quite probable that the action of the waves contributed to that result. No alarm was given by the Acme after discovering the defect in the wheel, and no effort was made to anchor the tow. An alarm would not have prevented the injury, and anchoring was impracticable. After the Chambers was aground, the master of the Acme made an examination of the steering gear. At a glance the defect in the rudder was discovered. It was repaired by a blow of the hammer, which fastened the key in its place. It is further contended by claimants that the imperfection in the rudder was due to no fault or negligence on their part; that the loosening of the key and the consequent accident were inevitable, and could not be foreseen, and therefore the doctrine of inevitable accident as enunciated in The Grace Girdler, 7 Wall. 196, 19 L. Ed. 113, and The Olympia, 61 Fed. 120, 9 C. C. A. 393, and other cases cited, applies. These cases do not strictly cover the question here involved. The loosening of the key may not strictly have been owing to any act of omission or commission by those in charge of the management of the Acme, although it is contended by libelants that the jumping of the rudder post earlier in the day, owing to the wind and swell, gave warning of the need of inspection of the steering apparatus. Nevertheless, it is the effect or consequence which followed the occurrence to the tiller to which the proofs direct attention. If the consequences of impairment of the helm could have been foreseen—and it was not clear from the evidence how it could have been otherwise—prompt measures should immediately have been adopted to prevent the impending injury. It is not enough for claimant to show that the cause of the casualty was due to an unavoidable and accidental fouling of the tiller, which could not have been foreseen by the exercise of reasonable care. They must further establish —for the burden of proof under the circumstances is upon them—that the effect and consequence of the inevitable occurrence could not have been prevented by the exercise of diligence and reasonable care. Such, I think, is the holding of the cases. What was done to avert the accident? True, the engine was reversed. Under the circumstances, this was not enough. The hawser rack aft, which covered the steering apparatus, was approximately 30 feet distant from the wheelhouse, which was midships. The evidence tends to show that the derangement of the helm could have been remedied within two minutes. This would have afforded ample time to avoid the grounding of the Chambers. The rule of law which exonerates a tug, when damages have been sustained by her tow, from the presumption that she was in fault, cannot be expanded to include her lack of ordinary diligence and care to prevent the consequence of unavoidable and unforeseen break of her steering apparatus. It devolved upon the Acme to show that everything was done which an ordinarily skillful navigator ought

to do to prevent injury. The Webb, 81 U. S. 406, 20 L. Ed. 774; The Olympia, supra; The Taurus and The Kate Jones (D. C.) 91 Fed. 796; The Rockaway (C. C.) 25 Fed. 775. No satisfactory excuse is offered why the impairment of the Acme's steering apparatus was not instantly discovered and as quickly repaired. Her master failed to seasonably perceive what an ordinarily skillful navigator under the circumstances should have perceived and guarded against. It is urged by claimant that the master of the Acme suddenly found his vessel in a position of danger, and, as it was without any fault for which the vessel is responsible, he cannot be held in fault because he has omitted to do something which he should have done to prevent the accident. I do not think that the doctrine of exoneration from fault committed in extremis is applicable to the case at bar. The danger which confronted the Acme was not such as to deprive her master of the required presence of mind to enable him to properly guard against the accident. It is not apparent why it did not occur to her master to at once make an examination of the steering gear, unless we accept his testimony of insufficient time. This testimony lacks force. The evidence clearly establishes that about five minutes elapsed after the helm failed to swing to starboard before the Chambers grounded. No precautions were taken except to reverse the speed of the tow, and to prevent the occurrence of what must have seemed inevitable. The master was not alone on the Acme. Others could have made the inspection if he deemed it necessary that he should remain at the wheel.

I am constrained to hold that the injury was sustained, irrespective of any of the other causes suggested by counsel for libelant, by reason of the failure of the Acme to use that degree of foresight and care which under the circumstances the law required. The Acme, therefore, must be held in fault. It is unnecessary to dispose of the question of limitation of liability at this time. The usual decree of reference to a commissioner may be entered.