## HAWGOOD & AVERY TRANSIT CO. v. MEAFORD TRANSP. CO.

### SAME v. WILLIAMS.

(Circuit Court of Appeals, Sixth Circuit. May 10, 1916.)

#### Nos. 2741, 2811.

1. COLLISION ⊂⇒123—BREAKING OF RUDDER—PRESUMPTION AND BURDEN OF PROOF.

Where a collision was caused by the breaking of the rudderstock of one of the vessels, there is a presumption of fault on her part, and she has the burden of proof to establish the defense of inevitable accident.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 259–261; Dec. Dig. ⊂⇒123.]

2. COLLISION ⊂⇒125—BREAKING OF RUDDERSTOCK.

Evidence *held* insufficient to sustain the burden resting upon a vessel to prove the breaking of her rudderstock, which caused a collision, was due to inevitable accident, resulting from latent defects in the stock, but rather tending to show that the stock was insufficient in size; it being a 9-inch stock placed in the vessel when she was originally built, although she had been rebuilt, her draft and tonnage increased, and her length increased from 360 feet to 432 feet, which under the classification of the Great Lakes Registry required a stock 10 inches in diameter.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 266–279; Dec. Dig. ⊂⇒125.]

Evans, District Judge, dissenting.

Appeals from the District Court of the United States for the Eastern District of Michigan; Arthur J. Tuttle, Judge.

Suit in admiralty for collision by the Meaford Transportation Company, owner of the steamer Bothnia, against the steamer S. S. Curry, the Hawgood & Avery Transit Company, claimant, and Ellen. Williams, administratrix of the estate of William Arthur Williams, deceased, intervener. Decrees for libelant and intervener, and claimant appeals. Affirmed.

H. D. Goulder, of Cleveland, Ohio, for appellant.

C. E. Kremer, of Chicago, Ill., for appellees Meaford Transp. Co. and others.

G. L. Canfield, of Detroit, Mich., for appellee Williams.

Before KNAPPEN and DENISON, Circuit Judges, and EVANS, District Judge.

KNAPPEN, Circuit Judge. The steamer Bothnia, owned by the Meaford Transportation Company, suffered collision in the St. Clair river with the steamer Curry, owned by the Hawgood & Avery Transit Company, resulting in the sinking of the Bothnia and the death of one of her crew. The Bothnia's owner filed libel (No. 2741) on account of damages to the ship and her cargo and the losses incurred by members of her crew. The administratrix of the deceased seaman filed libel (No. 2811) to recover for his death, right of action for negligent injuries causing death being given by the Michigan statute. 3 Comp. Laws Mich. §§ 10427 and 10428.

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In each case, the District Court found the Curry solely at fault, and decreed accordingly. The collision occurred at about midday; the Bothnia was downbound and on the American side; the Curry was upbound and in about the middle of the navigable channel, which at this point was about 800 feet wide. Shortly before the collision the two steamers had made a port to port passing agreement. The steamer Mackinac, also upbound and astern of the Curry, had made an agreement with the latter to pass her on her starboard hand. As the Mackinac was overhauling the Curry, the latter sheered sharply to port, striking the Bothnia. The sheer was occasioned by the breaking of the Curry's rudderstock (the shaft which supports and operates the rudder blade) and the resulting loss of the rudder. The sole fault on the Curry's part now relied on is the insufficiency of her rudderstock in size and strength. In each case the defense is inevitable accident due to hidden defects in the stock. In both cases the important testimony was taken in the presence of the trial judge, who found that the rudderstock contained originally no inherent defect, and that its breaking was due solely to weakness resulting from insufficient size. The Curry's owner brought in the Mackinac in an attempt to establish her liability for the damage occasioned by the sinking of the Bothnia, as well as the injuries sustained by the Curry; but the Mackinac was exonerated and she has passed out of the case. There is no claim that the Bothnia was in fault.

[1] The manner of the accident raises a presumption of negligence, and the burden of establishing inevitable accident rests upon the Curry. We need only refer to the decisions of this court in The Olympia, 61 Fed. 120, 122, 9 C. C. A. 393; Bradley v. Sullivan, 209 Fed. 833, 834, 126 C. C. A. 557; The Steamer E. M. Peck, 228 Fed. 481, 143 C. C. A. 63.

The hidden defects relied upon by respondent are the alleged presence of an excessive amount of slag or cinder in and undue crystallization of the metal of the stock. The evidence fails to satisfy us that there was any undue amount of slag or cinder. While two expert witnesses for respondent testified to the discovery of particles of slag or cinder at the point of the break, one of these witnesses said it occurs "in that sort of iron generally," and that he saw nothing wrong except the "granular formation" or crystallization; and while the other witness, after testifying that the presence of slag in this kind of iron is common, in reply to a question whether "there is an unusual amount of slag there," said, "I think there is," we are not impressed that such was the case. The normal life of a rudderstock is at least the life of the ship.

It is beyond dispute, however, that the break was due to abnormal crystallization; that long-continued vibration would tend to crystallize the iron; and that long-continued use of the stock "beyond its ordinary power of elasticity" would sufficiently account for the excessive crystallization found in the metal of the stock at the point of fracture. It is also beyond dispute that crystallization from use would be more rapid if the stock was too small or weak. The only question is whether there was excessive crystallization inherent in the manu-

facture, or whether the condition was the result of long-continued and excessive strain.

Apart from the question whether the rudderstock was large enough to conform to safe practice, the evidence, in our opinion, more strongly tended to show that the break resulted from weakness due to long-continued strain, rather than from defects originally inherent in the metal. One of respondent's expert witnesses speaks of the crystallization found as "a granular formation through the vibration and aging of it," and gives it as his opinion that the break was due to "a long course of vibrations." There was evidence of some wear just below the clamp, where the stock broke, as well as some "slip bands" in the place of fracture whose presence was said to be due to use. Unless, then, it is affirmatively established that the stock was large enough for the use to which it was put, the defense of latent defect fails.

The Curry, as built in 1893, was 360 feet between perpendiculars; her beam was 45 feet, her depth 26 feet, her certified tonnage about 3,200, her draft 15 to 16 feet, and her speed about 15 miles; her rudderstock was 9 inches in diameter. Later, as the channels were deepened, her tonnage was increased to 3,500, her draft then being about 16 feet. As the channels were still later deepened, the tonnage was increased to about 4,800, when she drew about 18 feet. In 1905 she was cut in two amidships, and 72 feet inserted, her length being thus 432 feet. Her beam and depth were unchanged. Her engines were moved aft (one of them taken out), her power reduced one-third, and her speed brought down to about 10 miles. Her rudder area was increased about 5 per cent. (an added weight of about 750 pounds), but the old rudderstock was retained without change. Since she was lengthened she has carried nearly 7,000 tons and has drawn at times 20 feet. At the time of the collision she was carrying 6,200 tons of coal and drew 17 feet 6 inches fore and aft. The Great Lakes Registry was established in 1896, three years after the Curry was built and nine years before she was rebuilt. Seventy-five to 90 per cent. of the boats on the Great Lakes follow the classifications of the Great Lakes Registry, whose rules, made by a committee of shipbuilders and experts, call for a 10-inch rudderstock for a vessel 432 feet long. As the strength of stocks varies as the squares of their diameters, a 10-inch stock has practically 25 per cent. more strength than a 9-inch stock—or as 100 is to 81.

If the Great Lakes classification is to be accepted, the defense of inevitable accident fails. But respondent presents several reasons why that classification should not be followed. In the first place, it is alleged that according to the rules of the Lloyds, the British Corporation, and the American Bureau of Shipping, a 9-inch rudderstock or less is called for by the Curry as rebuilt; but the vessels built under these classifications are designed almost entirely for ocean service, and it seems clear that in the Great Lakes service larger rudderstocks are required than in ocean service, on account of the greater strain in the lake service, due to the necessity of turning the vessel quickly in meeting and passing other vessels (as well as in frequent docking), often in narrow and sometimes in tortuous river channels, and against a cur-

rent, frequently requiring a hard and sudden putting over of the rudder.

It is also urged that the Great Lakes classification of rudderstock sizes is inaccurate, in that it is based solely on the length of the vessel, and so fails to take into account, as asserted, the factors recognized by the other organizations referred to, as well as by text-writers, as controlling—such factors being generally the area of the rudder blade, the "center of effort" of the rudder, and the speed of the vessel, its length being said to be taken into account only as it affects the area of the rudder blade.

But assuming that the factors mentioned are theoretically the proper ones to be taken into account, and that formulas based thereon yield more or less accurate results, yet such formulas are at the best only theoretical and approximate; for, as said by one of respondent's witnesses, it is impossible to determine accurately the center of pressure on the rudder and to compute accurately the pressure on it. Manifestly, an increased strain on the blade increases the strain on the stock, and the pressure and strain vary with the angle of the blade and are increased by hard and sudden putting over of the rudder. We are also satisfied that the resistance offered by the vessel's displacement, at least to the extent represented by the plane of its submerged area, whose factors are length and depth, directly affects the strain upon the stock, especially in case of the sudden and hard putting over of the rudder, as when the vessel is being handled in a heavy sea or in "close quarters," or, even if the effect of the displacement plane upon the strains to the rudderstock should be called indirect, a relation between the two surely exists, at least to the extent that the same rudder must be put harder over with a long boat than with a short one, both moving at the same speed, in order to get the same swing in the same time.

Again, it is urged that the effect of different speeds upon the rudderstock varies with the square of the speed, and that the decrease in speed, due to the rebuilding of the boat, more than compensates for the added length.

Granting the truth of the first proposition, all other things being equal, yet not only is speed but one factor in determining the required strength of stock, but it is doubtless true, especially in the lake service, that the strain upon the rudder is frequently greatest when the vessel is proceeding at moderate speed, as in the case of hard and sudden putting over of the rudder. Indeed, it seems obvious that the slower the speed the larger the rudder needed for easy steering, and the greater the speed the less deflection of the rudder blade is required for turning. It seems to come to this: That however scientifically and theoretically formulas may be worked out, security lies only in increasing the theoretical strain under the most favorable conditions by a factor of safety large enough to cover all unfavorable conditions and excessive strains; and it is possible that the practical difference between the Great Lakes Registry and one or more of the other organizations referred to lies in the employment by the former of a larger factor of safety.

Nor does it follow from the fact that under the Great Lakes classification the length of the vessel determines the size of rudderstock that the factors recognized by the other organizations are ignored; it may well be that the length of the boat, taking into account the somewhat special class of lake freighters (and thus their approximate relations of displacement and speed), has proven in practice fully as accurate a measure of required rudderstock as the formulas used by organizations concerned principally with ocean. traffic. Nor, having in mind the character of the board which makes the requirements, is it likely that the formulas and experience embodied in other classifications have been overlooked. On the contrary, the measurable interrelation between its requirements and those of the other organizations (so far as they appear in the record) tends to suggest the contrary.

Again, it is argued that vessels on. the Great Lakes of 432 feet length have now generally a beam of about 50 feet (instead of the Curry's 45 feet) and a depth of 30 feet (as against the Curry's 26 feet), as well as a larger rudder blade than the Curry's and that the Great Lakes classification assumes that vessels built under its rules will conform to such type and so will have the same proportionate speed and dimensions; and it appears that a few boats built over as was the Curry have rudderstocks (presumably their old ones) which are smaller than now called for, and as small as 9 inches in diameter, and that a few of such rebuilt boats are favorably rated in the Great Lakes Registry. This argument has weight, but not sufficient, we think, to overthrow the force of the existing rules, in view of the facts that a 10-inch rudderstock is prescribed for a boat 432 feet in length and only 27 feet in depth, that the same sized rudderstock is prescribed for boats varying in length several feet, that 9 inches is the minimum now recognized for boats of the length of the Curry before rebuilding, that the latter's speed is but slightly less than the average boat now built of her class, that for several years past no new vessels of the Curry's length have been built for service on the Great Lakes with a rudderstock less than 9¾ inches in diameter, and that the rating given the rebuilt boats referred to may have taken into account special considerations not appearing here.

We are impressed by the fact that a rudderstock which presumably, when originally put in, was not considered larger than safety demanded (and would not now be so considered for a boat of the Curry's previous dimensions), has been made to do duty in a vessel whose submerged plane is 50 per cent. greater than when the ship was first used, and whose actual tonnage carried has been at least doubled; and we think it reasonable that this increased displacement and increased load have added to the strain upon the rudderstock.

The fact that the break occurred after several years of excessive use, rather than when first so used, has no tendency to show that the break was not the result of wear and strain due to too small a stock; nor would even the fact that the rudder was being subjected at the instant of the break to no unusual strain be controlling. As Judge Tuttle aptly said:

"It seldom is possible, when some part of a machine is too weak, to tell just why it breaks at that particular instant."

The rudderstock was confessedly weak at the time, and the break doubtless resulted from putting the rudder "hard down" and quickly when proceeding against the current, and through fear of the effect (probably by way of suction) of the Mackinac's nearness in passing. It goes almost without saying that a latent defect which would excuse the Curry can only be an original structural weakness in the metal fiber of the stock; for assuming, without so holding, that a submission to the judgment of reputable builders of the question of the size of stock necessary for the rebuilt boat would protect respondent, the record fails clearly to show that the question of size of stock was submitted to the independent judgment of a builder, as distinguished from that of the owner. The old stock was presumably retained largely for the sake of economy, although, of course, in the view that it was sufficient.

It is a significant fact, impressing us, as it did Judge Tuttle, that:

"There never was a new ship built on these lakes as long as the Curry, with a rudderstock as small as this one."

Taking the entire record into account, we are satisfied the rudderstock broke because it was too small. We also think respondent has failed to sustain the burden of showing that in continuing the use of the rudderstock in question it exercised the high degree of care and foresight necessary, under the decisions of the Supreme Court and of this court, to maintain the defense of inevitable accident.

The decree of the District Court in each case is accordingly affirmed, with costs.

EVANS, District Judge. I cannot rid myself of the conviction that the owners of the Curry used due care in selecting its rudderstock when she was built and in retaining it when she was lengthened, that this was demonstrated by the direct testimony and by 19 years of active use, which brought no visible sign of any defect previous to the collision with the Bothnia, that under these circumstances she should not be held to have absolutely guaranteed its soundness, and consequently that the breaking of the rudderstock on that occasion was the result of inevitable accident, as that phrase is defined by the authorities.

Upon these grounds it seems to me, though the result may be harsh, that the rule stated and applied by the Supreme Court in The Morning Light, 2 Wall. 550, 560, 17 L. Ed. 862, by this court in The Olympia, 61 Fed. 120, 9 C. C. A. 393, by Judge Benedict in The Flowergate (D. C.) 31 Fed. 762, and by Judge Toulmin in The Lizzie Frank (D. C.) 31 Fed. 477, upon substantially similar conditions, should govern our decision, with the result that the judgment be reversed.