GREAT LAKES TOWING CO. v. AMERICAN SHIPBUILDING CO.

(Circuit Court of Appeals, Sixth Circuit. June 30, 1917.)

No. 2963.

1. ADMIRALTY ⬅118—APPEAL—REVIEW.

Findings of fact and law made by a commissioner in admiralty, concurred in by the District Judge, will be accepted as correct by the appellate court unless clearly wrong.

2. TOWAGE ⬅11(7)—INJURY TO TOW—NEGLIGENCE OF TUGS.

A newly launched steamer without machinery or rudder and standing very high in the water was taken by two tugs from the builder's dock on a river to the harbor a mile distant to be turned around and brought back. When near the harbor, the wind increased to 25 or 30 miles an hour, striking the steamer broadside, and after entering the harbor she was blown against a breakwater and injured and was again injured by striking a pier

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

when re-entering the river. *Held* that, the steamer being helpless and wholly under control of the tugs, the happening of the injuries under all the circumstances existing raised a presumption of negligence and cast upon them the burden of proving its absence; that the evidence did not sustain such burden, but showed that the tugs were negligent in proceeding down the river at such speed that the movement could not be stopped in time to prevent the collision; and also that one of the tugs at the stern of the steamer failed to co-operate with the other to turn the steamer to head into the wind.

3. TOWAGE ⬡⟶15(2)—INJURY TO TOW—INEVITABLE ACCIDENT.
The burden of showing inevitable accident in such case as the cause of the injuries to the steamer rested on respondent.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Ohio; John H. Clarke, Judge.

Suit in admiralty by the American Shipbuilding Company against the Great Lakes Towing Company. Decree for libelant, and respondent appeals. Affirmed.

H. D. Goulder and T. H. Garry, both of Cleveland, Ohio, for appellant.

H. A. Kelley, of Cleveland, Ohio, for appellee.

Before KNAPPEN, MACK, and DENISON, Circuit Judges.

KNAPPEN, Circuit Judge. The case grows out of this situation, generally stated: The ship Percival Roberts had recently been launched at the shipbuilding company's dock at Lorain, Ohio; the dock being located upon Black river (the lower part of which forms the inner harbor of Lorain), and about a mile from Lake Erie. The outer harbor is formed by two breakwaters, the west breakwater extending due north and south, the easterly one lying in a generally northwesterly and southeasterly direction, the opening between the pier heads of the two breakwaters being on a line with the generally northwesterly course of the lower part of the river. The ship was not equipped with engines, boilers, machinery, or anchors; she was practically only a hull; she lay headed down the river. It was necessary to head her up the river in order to install the engines and boilers. The towing company was accordingly employed to tow the ship down the river, bow foremost, wind the ship about in the outer harbor, and tow her back to the dock, headed up. In the course of this maneuver, the ship was driven by a southwesterly wind against the east breakwater, and the starboard side of the ship damaged. In re-entering the river the ship was allowed to collide with the northwest corner of the east (river) pier, sustaining damage to her port side. To recover the damages the shipbuilding company filed libel in personam against the towing company, charging the latter's sole fault. The towing company denied fault on its part, and alleged at least contributory fault on the part of the shipbuilding company. The case was referred to a master commissioner to take proofs and report, with his findings of fact and conclusions of law. The master found the towing company

⬡⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

solely at fault. The district judge confirmed the master's report, and decreed accordingly. The appeal is from that decree.

The Roberts was 600 feet long and had a depth of 32 feet. At the time of the maneuver in question she drew but about one foot forward and about five feet aft. She was without officers and crew, and was herself completely helpless. The tugs had sole control of her navigation; the six or seven of libelant's men on board the ship (none of whom were sailors) being there only to handle lines, or otherwise act under the tugs' direction. The tow left the dock at about 8 a. m. There was then but a slight wind. The tug Pierce was pulling on a short line from the steamer's bow; the tug Excelsior, with a line at her bow, was at the steamer's stern, acting as the steering tug. When the tow was still in the river, and the steamer's bow about 190 feet inside the piers, a strong southwesterly wind was encountered. No effort was made to stop the tow or slow down. Her speed already reached was about five miles an hour, and was immediately increased to seven miles. The Excelsior continued under the steamer's port, quarter, to help hold her up in the wind until the steamer's stern had cleared the piers, whereupon the Excelsior's engines were stopped. The wind, which struck the steamer practically broadside, carried her toward the east breakwater, taking the Pierce with her. Meanwhile, the Excelsior did nothing at all until the steamer was about 900 feet from the piers and within 200 feet or 300 feet of the breakwater, when her master made his line fast to his tug's stern tow-post, then heading up and pulling. The steamer continued to drift until it struck, the Excelsior's line having meanwhile parted. After about half an hour the Roberts was pulled from the breakwater by the two tugs, the Excelsior using at the last a wire cable furnished by the steamer, the manilla line having again broken. The Roberts was worked to a position athwart the piers, a few hundred feet outside (bows to the west), with the idea of pivoting her on the end of the pier. While the Pierce pulled on the bow, the Excelsior put her stem against the steamer's port side, in an effort by pushing to cushion her around the corner of the pier, but failed, because, as claimed, of the slipping of the tug's stem on the steamer's side, due to lack of line. The collision with the pier followed.

[1] The master, upon a careful review of the testimony—all of which was taken before him—found the tugs negligent in going down the river at such speed that the tow could not be stopped in less than 700 feet (as claimed), and in making no effort to stop when the Roberts was still 190 to 200 feet inside the piers; that the tug Excelsior was negligent in stopping her engines and doing nothing from the time the Roberts' stern cleared the end of the pier and until, as before stated, the steamer was within 200 to 300 feet of the breakwater; and that the collision with the pier head was due to mismanagement of the tugs in making the maneuver and in not advising the Roberts of the alleged plan to pivot her into the river on the end of the pier, and where lines would be needed in making the maneuver successful. The then district judge (the present Mr. Justice Clarke), upon a careful examination of

the briefs and record, expressed himself as "entirely satisfied with the findings of the master with respect both to the facts and to the law." These concurring conclusions of master and judge must be accepted as correct unless clearly wrong.[1]

[2] The tugs were in complete and sole control of the steamer's navigation, and, while they were not insurers of the steamer's safety (The Margaret, 94 U. S. 494, 24 L. Ed. 146), they were bound to exercise such care as would be commensurate with the situation. The towing company was in the habit of performing service of this nature, in this same port, and for the same shipbuilding company; it was familiar with the surroundings; it alone finally determined whether the movement could prudently be then had, although, in fact, the libelant's manager also thought the morning a good one for the purpose. These facts, as well as the helpless condition of the steamer and the season of the year, determined the care required of the tugs; and the happening of the accident under the circumstances existing raises a presumption of negligence, casting upon the tugs the burden of proving its absence.[2]

The most prominent defense asserted is that the weather conditions existing when the tow left the dock were such as to justify the movement; that the wind encountered just before leaving the river, and, when (it was alleged) it was too late to discontinue the maneuver, was a sudden storm of unusual violence, amounting to a squall or gale; and that this wind was the proximate cause of the stranding and an efficient cause of the collision with the pier, constituting inevitable accident within the meaning of the law, and working thus a complete defense.

[3] The burden of showing inevitable accident rests upon the respondent.[3] We think this burden has not been sustained. According to the weight of the evidence, the wind encountered was one of about 25 to 30 miles per hour, and was not a gale. The master thought it a fair presumption that it was "a fresh wind of perhaps 28 miles per hour." Moreover, it blew from the same direction from which the testimony tended to show a very light wind had been blowing for some little time before. True, the strong wind encountered just before the river was left had come up quite suddenly, and was such as to make it imprudent to expose to it the immense broadside of the powerless,

1 Cleveland v. Chisholm (C. C. A. 6) 90 Fed. 431, 434, 33 C. C. A. 157; United Steamship Co. v. Haskins (C. C. A. 9) 181 Fed. 962, 964, 104 C. C. A. 426; Monongahela, etc., Co. v. Hurst (C. C. A. 6) 200 Fed. 711, 119 C. C. A. 127; Erie & Mich. Nav. Co. v. Dunseith (C. C. A. 6) 239 Fed. 814, 816, —— C. C. A. ——; Wabash Ry. Co. v. Compton (C. C. A. 6) 172 Fed. 17, 21, 96 C. C. A. 603.

2 The W. G. Mason (C. C. A. 2) 142 Fed. 913, 915, 74 C. C. A. 83; Hawgood Transit Co. v. Meaford Transportation Co. (C. C. A. 6) 232 Fed. 564, 565, 146 C. C. A. 522; Gt. Lakes Towing Co. v. Shenango Steamship Co. (C. C. A. 6) 238 Fed. 480, 485, —— C. C. A. ——, and cases there cited.

3 The Olympia (C. C. A. 6) 61 Fed. 120, 122, 9 C. C. A. 393; Bradley v. Sullivan (C. C. A. 6) 209 Fed. 833, 834, 126 C. C. A. 557; Hawgood Transit Co. v. Meaford Transportation Co., supra, 232 Fed. at page 565, 146 C. C. A. 522; Australia Transit Co. v. Lehigh Transportation Co. (C. C. A. 6) 235 Fed. 53, 55, 148 C. C. A. 547.

rudderless, and empty hull, standing, as it did, high out of the water; and we do not doubt that the tugs' navigators would not have left the dock had they anticipated such a blow. The movement required fine weather, although perhaps the maneuver could safely have been executed in the face of the light wind which the testimony tended to show existed on the lake when the tow left the dock, although not very noticeable at the latter point. But while a wind of the nature and velocity encountered was unusual at that season of the year, it was by no means unprecedented. On the contrary, it is the undisputed evidence of an officer of the Weather Bureau that such blows occur on an average three or four times during each month of December; and we think the towing company was bound to anticipate this as a not improbable occurrence, and to use due care in the premises. Assuming, without being entirely convinced, that when the high wind was encountered the maneuver could not be discontinued, and without determining whether respondent was negligent in undertaking the maneuver without further knowledge of actual conditions on the lake, in view of the more than mere possible intervention of such a wind at that time of the year, and of the exposed and helpless condition of the steamer, we agree with the essential conclusion of the court below that the tugs were negligent in proceeding down the river with such speed that the movement could not be stopped in time to prevent stranding.

Moreover, it is clear that the Excelsior was guilty of positive fault, which we think directly contributed to the stranding. Prudent navigation required that the Roberts be headed, if possible, into the wind, and apparently the Pierce was exerting efforts to that end. The Excelsior should have assisted in that movement, by way of shoving or pulling the steamer's stern about. No attempt in this direction was made by her; instead, she did nothing except, when the Roberts was already drifting toward the breakwater, to aid in a futile attempt to hold her broadside against the wind. The master of the Pierce testified that, if the Excelsior had had a line out, she "could have shoved the stern down; it would have released the pressure on the bow, so that the 'Pierce' would not have had any trouble to keep her up." This impresses us as entirely reasonable.

We think it clear that the breaking of the line furnished by the Roberts did not contribute to the stranding, for we agree with the conclusion below that by the time the Excelsior commenced her pull on the steamer's stern the stranding was bound to occur, whether the line held or not. The two tugs could not have held the steamer as against the broadside wind.

It is also urged that the subsequent collision with the pier was due to the Roberts' failure to furnish a line to the tug. There is no evidence of request therefor, excepting that the Excelsior, when she found that her stem could not be held without a line against the Roberts' side, blew (several times) several short blasts—apparently to attract the steamer's attention—and called out for a line. But there is no evidence that any one on the Roberts understood or heard the call. Indeed, the tug's master says "there was nobody around where the tug was, anyhow, to take a line," and that he "just called into the air."

We agree with the conclusion below that the collision with the pier head was due to mismanagement of the tugs, in the respects already referred to as found by the master.

We have not discussed all the considerations and arguments presented by respondent. We have, however, carefully considered them all, and are of opinion that the District Court did not err in finding respondent solely at fault for both the stranding and the subsequent collision, and that its decree should be affirmed.