CLARKSON COAL & DOCK CO. v. NORTHERN LAKES S. S. CO.

NORTHERN LAKES S. S. CO. v. CLARKSON COAL & DOCK CO.

(Circuit Court of Appeals, Eighth Circuit.   April 17, 1918.)

Nos. 4967, 4968.

1. WHARVES ⬤═20(1)—OWNERS—DUTIES OF.

The owner of a dock owes a duty to a ship docking there at its invitation to exercise ordinary care to prevent injury, and so is liable for injuries to a ship where the force of the wind was able to move a bridge or trestle used in unloading, because the jaws of the clamp intended to make the trestle fast did not firmly grasp the web of the rails on which it ran.

2. WHARVES ⬤═20(2)—INJURIES TO VESSELS—NEGLIGENCE.

Where a vessel which tied up at a dock at the invitation of the owner was injured when the wind moved a bridge or trestle provided for unloading, the dock owner cannot escape liability, it appearing that the clamp intended to make the trestle fast did not firmly grasp the web of the rails on which it ran, by showing that it purchased the device from reputable manufacturers and installed it under the direction of competent engineers; that rule applying only to latent defects.

3. WHARVES ⬤═20(1)—INJURIES TO VESSEL—ACT OF GOD.

Where a ship was injured at dock when a high wind moved a bridge or trestle used in unloading, which ran on rails, the dock owner could not escape on the ground that the injury was attributable to the act of God; it appearing that the velocity of the wind was not unusual for that locality in that time of year.

4. WHARVES ⬤═20(7)—DAMAGE TO VESSEL.

Where the damages to a vessel included loss of net earnings, and the evidence on the subject conflicted, held, that a decree fixing the earnings at a sum between the various estimates was warranted.

Appeal from the District Court of the United States for the District of Minnesota; Page Morris, Judge.

Libel by the Northern Lakes Steamship Company against the Clarkson Coal & Dock Company. From a decree for libelant, respondent appeals, and libelant cross-appeals, asserting the insufficiency of the damages. Affirmed on both appeals.

Thomas H. Garry, of Cleveland, Ohio, and H. R. Spencer, of Duluth, Minn. (R. W. Spencer, of Duluth, Minn., and Goulder, White & Garry, of Cleveland, Ohio, on the brief), for plaintiff.

Henry H. Flor, of St. Paul, Minn. (A. E. Boyesen and P. J. McLaughlin, both of St. Paul, Minn., on the brief), for defendant.

Before SANBORN, Circuit Judge, and TRIEBER and YOUMANS, District Judges.

YOUMANS, District Judge. During the navigation season of 1914, the Northern Lakes Steamship Company owned and operated the steamer Champlain. During the same season the Clarkson Coal & Dock Company owned and operated a coal dock with unloading rigs thereon at Duluth, Minn. The dock was known as the Clarkson dock.

The last-named company was engaged in the business of receiving coal by lake shipment and transporting it into the interior by rail.

The Clarkson dock is situated on the harbor front and extends out into the harbor from the shore 800, or 1,000 feet. It is about 500 feet wide. On the northerly side there is a dredged slip of about 200 feet in width. Loaded vessels went into this slip and made fast to the dock for the purpose of discharging their cargoes. Running along the edge of the dock lengthwise and about 5 feet from the slip was a single steel railroad rail mounted on and spiked to timbers. About 250 feet from the slip was another single steel rail, parallel to the rail next to the slip. On these two steel rails was erected a bridge or trestle holding the unloading device. At the end of the trestle were two steel legs. These legs were mounted on trucks, each truck having four flanged wheels. These trucks at each end of the trestle rested on the steel rails. Upon the legs thus mounted was constructed the steel trestle, extending over and across the dock for a distance of about 250 feet and at a height of about 50 feet. The entire structure could be rolled along the dock on the steel rails, and could be placed at any point where it was desired to unload a cargo. This structure occupied the easterly half of the dock. A similar structure, mounted and operated in the same way, occupied the westerly half.

The two structures were so built that they could be placed end to end and attached to each other, thus forming a trestle or bridge extending over the entire width of the dock. They were thus fastened together at the time of the accident shown in the testimony in this record. At the slip end of the bridge or trestle was an adjustable steel boom that could be extended out over the vessel. From the end of this boom steel buckets were lowered into the hold of the vessel being unloaded, and when filled these buckets were hoisted by steel lines by machinery on the bridge or trestle, and dumped into cars, which were run out over the bridge or trestle and dumped on the dock. This movable bridge or trestle was very heavy, and was held in place by adjustable clamps applied to the steel rail on which the legs supporting the trestle rested. The jaws of the clamps were designed to drop over and around the ball of the rail, and after being put in place were tightened against the web of the rail by turning a threaded screw.

On the afternoon of April 25, 1914, the outer trestle was shifted to a point near the outer end of the dock and connected end to end with the inner trestle, forming one continuous bridge as already described. On the following day the steamer Champlain arrived at the port of Duluth with a cargo of coal consigned to the Clarkson dock. The vessel did not immediately go into the slip, for the reason that the unloading boom of the trestle extended out over the slip. Later in the day the vessel shifted over alongside the Clarkson dock. On the morning of the next day the work of discharging the cargo from the hold of the vessel began, and continued during the day and the following night. A wind sprang up from the northeast during the early part of the night, and by 4 or 5 o'clock the next morning, the 28th, it had attained a velocity of 40 to 50 miles an hour or greater. The work of unloading was suspended about half past 5 o'clock in the

morning, and the unloading boom was left extended out over the deck of the vessel. Just before 6 o'clock the end of the bridge next to the trestle began to move along the track, and when it had run a distance of about 75 feet the trucks next to the slip left the track, the bridge collapsed, and a portion of it fell on the vessel, causing the damage complained of.

The Clarkson Coal & Dock Company appeals from the decree adjudging damages against it, and the Northern Lakes Steamship Company appeals because, as it contends, the amount of damages found by the court is not as large as it should be under the testimony. The six assignments of error of the Clarkson Coal & Dock Company can be reduced to one. That one is that the facts fail to show that it was negligent.

The testimony fairly shows: (1) That the Champlain came into the slip and moored at the dock at the invitation of the Clarkson Coal & Dock Company. (2) That when screwed up the jaws of the clamps did not press tightly against the web of the rail. (3) That an appreciable space was left between the jaws of the clamp and the web of the rail.

The Clarkson Coal & Dock Company contends: (1) That it procured from a reliable manufacturer and used under the direction of a competent engineer the best device obtainable for holding the bridge in place on the rails. (2) That the bridge fell as the result of an unavoidable accident, or an act of God.

[1, 2] The use of a clamp, the jaws of which would not tightly grip the web of the rail, was obviously inadequate to prevent a movement of the bridge along the rail. One of the objects of the use of the clamp was to prevent this movement by the force of the wind or any other power. The inadequacy of the clamp was patent, and inspection would have disclosed the ineffective character of the clamp for this purpose. The vessel was taken into the slip and tied up to the dock upon the invitation of the dock owner. The owner of the dock owed to the owner of the ship the duty of exercising ordinary care to prevent injury to the ship. Smith v. Burnett, 173 U. S. 430, 19 Sup. Ct. 442, 43 L. Ed. 756. That duty was not met by the use of a clamp that ordinary inspection would have disclosed did not grip the web of the rail. Union Pacific Railway Co. v. Daniels, 152 U. S. 684, 14 Sup. Ct. 756, 38 L. Ed. 597. The Clarkson Coal & Dock Company cannot absolve itself from liability by showing that it purchased the device from reputable manufacturers and put in the device under the direction of a competent engineer. That rule applies to latent defects, and not to patent defects. Richmond & Danville Railroad Co. v. Elliott, 149 U. S. 266, 13 Sup. Ct. 837, 37 L. Ed. 728; Westinghouse Electric & Manufacturing Co. v. Heimlich, 127 Fed. 92, 62 C. C. A. 92.

[3] The contention that the accident is attributable to an act of God is not sustained by the testimony. It was shown by the officer in charge of the Weather Bureau at Duluth that the velocity of the wind at and about the time the bridge fell was not unusual for that locality. The court was warranted in finding that the velocity of the wind was not such as to make the falling of the bridge an unavoidable

accident or an act of God. United States v. Kansas City Southern Railway Co. (D. C.) 189 Fed. 471; Great Lakes Towing Company v. American Shipbuilding Company, 243 Fed. 849, 156 C. C. A. 361.

[4] In the cross-appeal of the Northern Lakes Steamship Company it is assigned as error that it was not awarded $7,817.36, with interest and costs, the full amount of damages claimed by it. The court found that the libelant was damaged in the sum of $6,803.03, with interest and costs. The court made no findings of fact, nor was it requested to do so. The damages of the libelant consisted of three items: (1) The cost of repairs; (2) the wages of the crew during the detention; and (3) the amount the vessel could have earned during the period it was detained for repairs. The first two items were susceptible of accurate determination. The third item could not be determined with the same degree of accuracy.

Mr. C. W. Bryson, the manager of the Northern Lakes Steamship Company, testified that the Champlain during one trip of the season, 1914, earned $324 per day, and that upon another trip during the same season the same vessel earned $326 per day. Mr. Robert H. Kidd, a marine surveyor and a ship builder, testified that the earning power of the Champlain during the season mentioned was $400 to $450 per day, and that the average daily expense of that vessel would be $225. According to Mr. Kidd's figures the net earnings of the Champlain would have been $175 to $225 per day. The court allowed a sum for demurrage or net earnings in excess of the amount testified to by Mr. Kidd and less than the amount testified to by Mr. Bryson. We cannot say that the amount found by the court was not correct, or that the testimony warrants a larger amount.

The decrees in both cases will be affirmed, with costs to the Northern Lakes Steamship Company in No. 4967, and to the Clarkson Coal & Dock Company in No. 4968.