## THE ENTERPRISE.

### (District Court, D. Connecticut. March 9, 1915.)

### No. 1865.

1. TOWAGE ☞11—LIABILITY FOR LOSS OF TOW—PROXIMATE CAUSE.

A tug, under contract to tow barges laden with stone from the quarry to a breakwater, in the construction of which the stone was being used, became disabled by an injury to her rudder, and the barges, after unloading, were compelled to anchor, and several hours afterward, while so anchored and in a high wind, one of them sank. There was no negligence on the part of her crew, and she was in good condition, and could have been towed to a place of safety. *Held*, that the breaking of the tug's rudder was the proximate cause of the loss.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23; Dec. Dig. ☞11.]

2. TOWAGE ☞3—CONTRACT—IMPLIED TERMS.

In a contract of towage there is an implied obligation that the tug shall be efficient and properly equipped for the service, from which the owner is relieved only when a breakdown is from causes which could not have been discovered and prevented.

[Ed. Note.—For other cases, see Towage, Cent. Dig. § 3; Dec. Dig. ☞3.]

3. TOWAGE ☞11—LIABILITY OF TUG FOR LOSS OF TOW—DEFECTIVE EQUIPMENT.

A tug under a continuing towage contract broke her rudder, and as a result one of her tows was lost. She was inspected six months before, but it was shown that the rudder was not properly tested to discover any defect in the iron casing, which broke. *Held*, that such inspection did not relieve her from liability under the towage contract.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23; Dec. Dig. ☞11.]

4. TOWAGE ☞15—LIABILITY FOR LOSS OF TOW—INEVITABLE ACCIDENT—BURDEN OF PROOF.

The burden rests on a tug to establish the defense of inevitable accident, to exonerate her from liability for the loss of a tow through the breaking of her rudder.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 30–38; Dec. Dig. ☞15.]

In Admiralty. Suit by Peter Beattie and John Beattie, Jr., executors of the estate of John Beattie, deceased, against the steam tug Enterprise. Decree for libelants.

Samuel Park, of New York City, for libelants.

George Whitefield Betts, Jr., and Francis H. Kinnicutt, both of New York City, for claimants.

THOMAS, District Judge. This is a libel in rem to enforce a claim for damages against the steam tug Enterprise, arising from the breach of a towage contract entered into between the libelants, who are contractors, with quarries at Leete's Island, on the Connecticut shore of Long Island Sound, and the claimants, who are owners of the Enterprise.

The charter party is contained in two letters, dated, respectively, November 28, 1912, and November 29, 1912; the first letter being from

the claimant's managing owner to the libelants, and the second being the libelants' reply thereto. In the latter letter the libelants impose the condition that the Enterprise, which had been selected by the claimants for the purpose of the charter party, shall be "capable of doing our work."

This charter party called for the transportation of stone, at an agreed price, from the libelants' quarries to a breakwater off Kelsey's Island, to the eastward of Leete's Island some 12 miles on the Connecticut shore of Long Island Sound, which the libelants were constructing under a contract with the United States government. The breakwater extended from the north shore of Long Island Sound in a southerly direction out into the Sound. After the execution of the charter party and pursuant thereto, the claimants began the work of transporting stone from the quarries to the breakwater with three schooner barges, viz., the John L. Gilmore, the American Eagle, and the Tom Beattie, all owned by the libelants. None of these boats were equipped with sails (excepting a small jib on the Eagle and the Tom Beattie), and all of them were entirely dependent upon the steam tug for motive power.

The steam tug was under the exclusive control and possession of the claimants, with a crew employed by them. Each of the schooner barges had her own crew, employed by the libelants for the purpose of loading and unloading the barges. The loading and unloading of the barges and the movements of the barges and the tug were subject to the instructions of libelants' superintendent.

The work of transporting stone from the quarries to the breakwater continued without interruption until January 31, 1914. About 4:25 in the morning of that day the Enterprise, with the three schooner barges mentioned, laden with stone, left Leete's Island, and arrived at the breakwater about two hours later.

On arriving at the breakwater, the Gilmore was left on the east side, where she commenced to discharge her cargo, making fast to the breakwater with two lines. At that time the wind was from the east, but soon veered to the southeast, and later freshened considerably, blowing harder at 11 o'clock, and held there until 3 or 4 o'clock in the afternoon. About 10 o'clock the Gilmore was shifted from the east to the west side of the breakwater, in order to get protection from the wind afforded by the breakwater. After the tug had shifted the Gilmore, she anchored to a buoy on the west side of the breakwater, where she encountered considerable wind and sea coming in around the end of the breakwater, which, according to the testimony of three of claimant's witnesses, was enough to have the water come up over the scuppers of the Enterprise as she lay in the trough of the sea.

There is some contrariety between the testimony of libelants' and claimant's witnesses as to the varyings and force of the wind, but it is not of sufficient importance to affect the vital issues in the case.

Some time before 1 o'clock in the afternoon, after the tug had anchored, she broke loose from the buoy twice; the first time being due to the breaking of the hawser attached to the buoy, and the second time to the slipping of the line. On the first occasion the tug drifted

only long enough to turn around and come back, but the second time she drifted possibly a quarter of a mile away from the breakwater. The captain of the tug then discovered that her rudder was disabled, whereupon she backed up under the lee of the breakwater, about 600 feet therefrom, and well inshore, after vainly trying to repair the damage to the rudder. This time is fixed as about 1 o'clock in the afternoon.

In the interim the barges had finished their unloading and were anchored off the breakwater. The Eagle was the most southerly, the Gilmore next, and the Beattie the most northerly; the Gilmore being nearer the breakwater than the others, and, according to the testimony of the libelants' superintendent, a distance of about 250 or 300 feet from it at that time. Thereupon (the barges having finished unloading) the libelants' superintendent hailed the captain of the Enterprise and ordered him to take the barges back to Duck Island, a distance of not quite 2 miles from the breakwater. He was then informed by the captain of the Enterprise that this was impossible, owing to the disablement of the tug's rudder. The captain of the tug was unable to give satisfactory information as to the cause of the breaking of the rudder.

Later in the afternoon, between 3:30 and 4 o'clock, the wind changed from the southeast to the southwest, and with this change of the wind the Gilmore swung in from her anchorage nearer to the breakwater, so that, according to her captain, she was only 50 feet from it. Her crew then payed out a line to one of the buoys to make her more secure, but her small anchor chain parted, so that she had only one line and one anchor out. Between 5:30 and 6 o'clock of the same afternoon the captain of the Gilmore and her crew left the Gilmore in a yawl, and after picking up a man on the Enterprise rowed ashore, and the captain returned to his home at Leete's Island. The Gilmore remained above water until early the next morning, when she sank. Later in the morning of February 1st the Beattie and the Eagle were towed back to Leete's Island by a wrecking tug, which had been summoned by the libelants from New London for that purpose.

Three defenses are interposed by the claimants: (1) That the unseaworthiness of the Gilmore and negligence upon the part of her crew were the proximate causes of the loss and damage complained of; (2) that the tugboat was not a common carrier, and is liable only for the lack of ordinary care, and that not only have the libelants failed to prove lack of ordinary care, but the claimants have proved ordinary care by showing an inspection in June, 1913, when no defect in the rudder was found; and (3) that the breaking of the rudder was an inevitable accident, upon which no liability can be predicated.

[1] I. The charge that the unseaworthiness of the Gilmore and the negligence of her crew were the proximate causes of the loss and damage complained of is not sustained by the evidence. It clearly shows that the Gilmore was not in any worse condition in respect of leaking than barges carrying large quantities of stone naturally would be or usually are. Her condition in that respect was that which would naturally be expected of a barge subjected to the strain of heavy cargoes

of stone and was in no respect dangerous. The crucial question is whether the sinking of the Gilmore was occasioned by the negligence of the crew which was in the employ of the libelants, or by the breaking of the rudder on the Enterprise. This is largely a question of fact, dependent upon the circumstances. It is clear from the evidence, that, until the rudder of the Enterprise had given out, she was under complete control, and the evidence makes it equally clear that the breaking of the rudder preceded the disability of the Gilmore by a considerable time, and that the Gilmore could have been extricated from her position of danger and saved from sinking by the Enterprise, if the latter's rudder had not given out. The conclusion is therefore inevitable that the proximate cause of the loss and damage sustained by the libelants was the breaking of the rudder.

" 'Cause' and 'consequence' are correlative terms. One implies the other. When an event is followed in natural sequence by a result it is adapted to produce, or aid in producing, that result is a consequence of the event, and the event is the cause of the result." Monroe v. Hartford Street Railway Co., 76 Conn. 201, 207, 56 Atl. 498, 501.

Another definition of proximate cause equally apt is that given by Chief Justice Baldwin in Smith v. Connecticut Railway & Lighting Co., 80 Conn. 268, 67 Atl. 888, 17 L. R. A. (N. S.) 707. On page 270 of 80 Conn., on page 889 of 67 Atl. (17 L. R. A. [N. S.] 707), he said:

"That only is a proximate cause of an event, juridically considered, which, in a natural sequence, unbroken by any new and intervening cause, produces that event, and without which that event would not have occurred. It must be an efficient act of causation separated from its effect by no other act of causation."

With these clear definitions as a guide, all the more is the conclusion imperative that the negligence of the crew of the Gilmore was not the proximate cause of the loss. Moreover, the evidence does not seem to sustain the claimant's contention that the management of the Gilmore by her crew in any way contributed to her sinking. She was without motive power, and there is sufficient evidence to justify the conclusion that she was not abandoned until it was apparent that she could not remain above water, and the abandonment took place about six hours after the rudder on the Enterprise was disabled. In brief, there was no negligence on the part of the crew of the Gilmore of such a character and so related to the resulting injury as to be considered an efficient or proximate cause of her sinking. And it is immaterial whether the form of recovery is in contract or in tort, for the steam tug is liable in either case for the acts and defaults of her owners, or those who are her lawful agents or representatives.

[2] II. The claimant's second contention is not well taken. In view of the established facts, the case does not fall within the well-known principle invoked by them. The law is well settled that in a contract of towage there is an implied obligation that the tug shall be efficient and properly equipped for the service, provided, of course, that the breakdown did not arise from causes which ordinary care could have discovered and prevented. The Undaunted, 11 Prob. Div. 46, 5 Aspinall's Reports (New Series) 580; and The Ratata, [1897] Prob. Div. 118, 8

Aspinall's Reports (New Series) 427, affirmed on appeal [1898] App. Cas. 513. It is of no importance that the libel contains no allegation of a warranty and a breach thereof. The tug's liability is one of contract. The Ratata, [1897] Prob. Div. 130, supra.

The Undaunted, supra, is apposite. It was an action by a tow against the tug for a serious delay in the delivery of the tow's cargo, occasioned by an inadequate supply of coal, and it was held that in a towage contract there is an implied obligation that the tug shall be efficient and properly equipped for service. Sir Charles Butt, of the admiralty court, in pronouncing judgment against the tug said (page 48):

"It is important that owners of steam tugs should not be released from the obligation to send them to fulfill the service they have undertaken, adequately and properly equipped. The breach by tug owners of this obligation may give rise to most serious consequences to vessels intrusted to their care."

The Ratata, supra, is equally instructive and in point. It was there held that it was an implied term of the contract between a tug and her tow that the former had taken reasonable care to supply a properly equipped leading tug, so as to enable the string of barges attached to her to get safely to their destination. In the Court of Appeal, Lord Esher said (pages 127, 128):

"I therefore put this case on the ground that they owed that duty to each of these vessels. They were paid for that duty, and they were bound to see that the operation was properly conducted. There is evidence to show that it was not properly or efficiently conducted, and that threw the burden upon the defendants to show that they had taken every reasonable precaution to prevent a breakdown. Under that burden they fail; and therefore judgment must go against them, and they must be made liable to the plaintiff for what happened."

Lord Justice Lopes said (page 128) that the undertaking of the defendants was that:

"They will use reasonable care in the case of each vessel that there shall be a tug efficient in hull, in equipment, and in crew."

And Lord Justice Chitty said (page 130):

"The case against the defendants cannot be rested upon any warranty on their part, but it is one of contract, and the question is: What is the nature of the duties the contract imposed upon them? In my opinion, in conducting this towage operation, it was the duty of the defendants to take all proper and reasonable measures to insure that the vessel should be safely towed up on the occasion in question."

[3] The claimants argue that as this was practically a continuous voyage, going back to the date of the charter party, no implied duty rested on the claimants to make an examination before each trip. They further contend, and the evidence shows, that an examination of the tug had been made in June, 1913, when she was hauled out on the marine railway at New London, and that this inspection showed that the rudder was then in a reasonably safe condition. The rubber construction was unusual. As the description is somewhat technical, I quote from claimant's brief:

"The rudder itself and stock were of wood, and were inclosed for the most part in an iron casing. Down to the point where the rudder stock joined the

blade of the rudder, the casing consisted of a cylinder made of wrought iron five-sixteenths of an inch thick. At the point where the top of the rudder joined the stock the cylinder was opened up, and iron plates were attached to either flange, which made a casing or hood extending out over the rudder proper. This case or hood was reinforced and strengthened by an iron collar or band riveted on at the top of the rudder proper where it joins the stock. The collar was put on to strengthen the rudder post. The break in the cylinder occurred at a point below the water line and just below or practically level with the place where the rudder joined the stock and where the casing was reinforced by the iron collar."

There was no fastening through the iron cylinder and into the rudder stock to make it secure. As the rudder stock runs up through the rudder port it was not exposed to a visual examination. When the iron cylinder broke, the rudder was useless and the tug unmanageable.

That the examination or inspection made at New London, in June, 1913, was visual and superficial, is fully borne out, not only by the testimony of those who made the examination, but by the testimony of Clarence C. Perry, a well-known expert of Hartford, editor of The Locomotive and special inspector for the Hartford Steam Boiler Inspection & Insurance Company. In answer to the question, "What would be necessary to make a proper examination of this flange, if she was hauled out in the marine yard?" The examination having been made while the tug was on the marine railway, Perry said:

"The first thing to do would be to go over it with a light hammer and determine whether the corrosion had extended deeply or not, by the ability to shell off the corrosion, scale, the iron oxide, with the light hammer. If that shelling off, in little scales of corroded iron, indicated that the corrosion had penetrated far into the iron, there would be two courses open: One might take a chisel and attempt to find by soundings of the corroded surface, which would be a bad thing to do from the standpoint of the metal, because it would expose the piece to further rapid corrosion; or one might chisel deeper, which has become the practice in boiler works, and actually measure the thickness of the iron, chipping a little hole and filling it with a plug, no injury being done."

And again he testified:

"An air hammer is taken with a rather blunt and chisel pointed tool, and by repeated small but very rapid blows of this air hammer or hand hammer with this chisel pointed peon the corrosion and paint and so on are scaled from the metal, leaving it as nearly clean as possible."

This witness further testified that the method referred to by him is the one pursued in navy yards upon boats of the navy and navy tugs. The superintendent of the marine railway at New London, where the Enterprise was hauled out in June, 1913, for inspection, admitted that he did not use a hammer on the cylinder to ascertain whether there were any breaks in it, and that he did not put a hammer on the cylinder or examine the cylinder closely to ascertain whether there were any flaws or breaks in it.

Another witness, McCarthy, produced by the libelants, testified that he never before saw a rudder constructed like this, and that it was impossible visually to make a proper examination of the iron covering this rudder had, and that a satisfactory examination could be made only with a hammer.

The fact, if it be a fact, that the defect in the rudder, whereby the loss and damage were occasioned, was latent, and unknown to the claimants, is no excuse. Such is the established law, as is set forth in The Edwin I. Morrison, 153 U. S. 199, page 215, 14 Sup. Ct. 823, 829 (38 L. Ed. 688), where in the opinion of the court, delivered by Chief Justice Fuller, it is said:

"The obligation rested on the owners to make such inspection as would ascertain that the caps and plates were secure. Their warranty that the vessel was seaworthy in fact 'did not depend on their knowledge or ignorance, their care or negligence.' The burden was upon them to show seaworthiness, and if they did not do so, they failed to sustain that burden, even though owners are in the habit of not using the precautions which would demonstrate the fact. In relying upon external appearances in place of known tests, respondents took the risk of their inability to satisfactorily prove the safety of the cap and plate, if loss occurred through their displacement."

The fact that libelants' reply letter to the claimants under date of November 29, 1912, imposed on the charter party the provision "that the crew of said tug shall at all times follow the orders given by us, provided the safety of said tug Enterprise is not impaired" is not material. In The Undaunted, supra, it was held that a provision in a contract of towage that the owners of the tug would not be responsible for the default of her master did not release them from the implied obligation to supply an efficient tug, that is to say, one properly equipped and properly supplied; and it must be taken as a fair intendment of the charter party that for the purposes of navigation the tug was under the exclusive control of the claimants, with a crew employed and paid by them, and fully responsible for the navigation of the tug until such time as the libelants interfered by giving their positive orders or instructions.

[4] III. The claimants have failed to prove that the breaking of the rudder was an inevitable accident. The onus of proof rested on them; the libelants having, in the first instance, established a prima facie case either of neglect or of want of seaworthiness.

The law laid down in The Merchant Prince, [1892] Prob. Div. 188, 7 Aspinall's Reports (New Series) 208, leaves no doubt on this point. This was an action for damages, by collision, in which it appeared that the plaintiff's vessel was at anchor in broad daylight in the Mersey, when the defendants' steamer ran into her. The defense was that the steam steering gear of the defendants' vessel failed to act, in consequence of some latent defect, which could not have been ascertained or prevented by the exercise of any reasonable care or skill on the part of the defendants, and that the resulting damage was caused by inevitable accident. The steam steering gear in question was good of its kind. It had never previously failed to act, and the cause of the defect in the machine or in its working could not have been discovered by competent persons. Part of the gear, including some portion of the chain, running between the wheel and the rudder, had been recently renewed, and it was admitted that new chain was liable to stretch. It was also proved that, before the vessel left her anchorage and proceeded on her voyage, the whole of the gear had been tested and found in good order, and that the chain had been tightened as occasion required. It was held by

the Court of Appeal, reversing the Admiralty Court, that the defendants were liable, as they had not discharged themselves of the burden cast on them by the prima facie case. Lord Esher said (page 188):

"If he [the defendant] cannot tell you what the cause is, how can he tell you that the cause was one the result of which he could not avoid?"

Lord Justice Fry said (page 189):

"The burden rests on the defendants to show inevitable accident. To sustain that the defendants must do one or other of two things. They must either show what was the cause of the accident, and show that the result of that cause was inevitable; or they must show all the possible causes, one or other of which produced the effect, and must further show with regard to every one of these possible causes that the result could not have been avoided. Unless they do one or other of these two things, it does not appear to me that they have shown inevitable accident."

The Circuit Court of Appeals of this circuit has cited and quoted with approval from The Merchant Prince, supra, in The Edmund Moran, 180 Fed. 700, 104 C. C. A. 552, and again in The Bayonne, 213 Fed. 216, 129 C. C. A. 560, where it was said by Judge Ward, delivering the opinion of the court, that the conclusion of inevitable accident—

"should only be adopted if either the cause * * * is shown and that it was unavoidable, or else all possible causes must be shown to have been unavoidable."

If this is the law in collision and negligence cases, there is equal, if not more, reason why it should obtain in the case of a towage contract, where there is an implied obligation of seaworthiness, and where, as stated by Kennedy, L. J., in the Court of Appeal in The West Cock, [1911] Prob. Div. 208, on page 231, 12 Aspinall's Reports (N. S.) 57:

"The burden of proof * * * lies upon the tug owner to show that it was as reasonably fit and proper a tug for use as skill and care could make it."

The court cannot, by approving a resort to mere conjecture as to the cause of the defect in the rudder, relax the important and salutary rule in respect of seaworthiness. The Edwin I. Morrison, 153 U. S. 215, 14 Sup. Ct. 823, 38 L. Ed. 688; The Alvena (D. C.) 74 Fed. 252, 255; The Phoenicia (D. C.) 90 Fed. 116, 119.

The libelants are entitled to a decree adjudging the Enterprise in fault, with a reference to a commissioner to ascertain the amount of damage sustained by them.

Decree accordingly.