AUSTRALIA TRANSIT CO. v. LEHIGH VALLEY TRANSP. CO. et al.

FEDERAL INS. CO. et al. v. AUSTRALIA TRANSIT CO. et al.

(Circuit Court of Appeals, Sixth Circuit. June 30, 1916.)

Nos. 2768, 2769.

1. COLLISION ☞61—DEFECTIVE STEERING GEAR—INEVITABLE ACCIDENT.

The sudden sheering of a steamship, bringing her into collision with a meeting vessel, due to the failure of her steam steering gear to work, either because of the fouling of the steering cable by cargo in the hold, or because same foreign substance had been carried by the steam current into a valve, preventing it from closing, cannot be attributed to inevitable accident, where the steering gear had stuck twice before within half an hour prior to the collision, but the vessel proceeded without any attempt to ascertain the trouble.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 78; Dec. Dig. ☞61.]

2. COLLISION ☞61—STEAM VESSELS MEETING—CONTRIBUTORY FAULT.

The meeting vessel and her tow also *held* chargeable with contributory fault for not taking steps to avoid the collision, when, after the exchange of passing signals, the disabled vessel, then nearly half a mile distant, began to sheer, and sounded two alarm signals.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 78; Dec. Dig. ☞61.]

Appeal from the District Court of the United States for the Eastern District of Michigan; Arthur J. Tuttle, Judge.

Suit in admiralty for collision by the Lehigh Valley Transportation Company, owner of the steamer Bethlehem, against the steamer Australia and the barge Polynesia, the Australia Transit Company, claimant, with cross-libel, and intervening libels of the Federal Insurance Company and others. From the decree, the Australia Transit Company and the Insurance Companies appeal. Modified.

In Case No. 2768:

H. D. Goulder and F. S. Masten, both of Cleveland, Ohio, for appellant.

G. L. Canfield and Sherwin A. Hill, both of Detroit, Mich., for appellees.

In Case No. 2769:

H. A. Kelley, of Cleveland, Ohio, for appellants.

G. L. Canfield and Sherwin A. Hill, both of Detroit, Mich., for appellees.

Before KNAPPEN and DENISON, Circuit Judges, and EVANS, District Judge.

DENISON, Circuit Judge. At about noon of June 13th, in the St. Clair river, the steamer Bethlehem, loaded and down-bound, and the steamer Australia, with the barge Polynesia in tow, up-bound, were in collision. Serious damage was done to both steamers and to the Bethlehem's cargo. The channel at this point was 1,500 feet wide. The Bethlehem was near the American shore, and the up-bound boats

were about mid-stream, and port passing signals had been exchanged, when the Bethlehem sheered across the stream and struck the Australia in the side. While still in that position and before the Bethlehem backed effectively, the barge Polynesia came on and struck the Bethlehem. Obviously, the initial burden of explanation is upon the Bethlehem; and she meets that burden upon the theory of inevitable accident. It is claimed in her behalf that her steam steering gear suddenly refused to work, and that she did everything possible thereafter to avoid the disaster, instantly reversing and continuing to back until after the collision, and blowing alarm signals; and she charges fault upon the Australia and Polynesia in that, with ample warning and opportunity to escape the collision, they did nothing whatever for their own safety, but came heedlessly along, whereby their fault was the sole proximate cause of the collision.

[1] The first thing to decide is whether the Bethlehem was at fault. The real cause of the trouble is very obscure. Only two theories are suggested, and one or the other must be adopted: The first is that the cargo fouled the steering cable in the hold; the other is that a fragment of packing or scale became detached and was carried by the steam current into a valve, preventing it from closing, and leaving it balanced, so that it would not operate in either direction. This seems to be a known possibility and is called "steam bind."

The first hypothesis has no direct evidence to support it. It is not at all impossible, since sugar, in bags, was piled very nearly to the cable, and if, through some slight shifting, one of the bags had come into position to be jammed into a leader by the cable passing through, it might naturally have produced the precise results that did occur. No such jamming was found when an examination was later made, but occurrences in the meantime might have removed all evidence of it.

If the second hypothesis is the right one, we are not satisfied that it should be considered as unseaworthiness existing when the ship left port; but it does not follow that the occurrence was inevitable accident. The steering engine had worked perfectly, during the entire voyage from Duluth, until about half an hour before this accident. At that time, it had "stuck," and on two occasions the wheelsman had been compelled to make an effort to get it past the sticking point. This had been reported to the captain, and, after the accident, was recounted by the wheelsman to the mate. If the refusal to work at the time of the collision was caused by this steam bind coming from the presence of such a fragment in the steam current, the trouble shortly before was presumptively from the same cause. The ship was chargeable with notice that this was the trouble, or, at least, that it might be the trouble; and the boat might have been stopped, or an emergency steering gear might have been put into use, while the engine was examined, to make certain that the fragment had been blown on through, so that it would give no more trouble. This was not done, and the ship took the risk that the troublesome fragment or another one like it might still be in the engine and might again find lodgment in the valve and give trouble.

In addition to both these theories of fault, it is to be observed that there was an interval of at least three minutes (the Bethlehem claims about twice as much) after it was known that the steering engine was disabled and before the collision. It would seem that the boat might well have been provided with an alternative or emergency steering gear, which could have been put into use within much less time; but this has not been argued as a ground of fault, and we do not depend upon it.

Considering the whole situation, we think the Bethlehem has failed to establish the existence of inevitable accident by that high degree of proof and with that measure of certainty which the law rightly demands to exculpate a vessel which has directly caused a collision. The Lackawanna (C. C. A. 2) 210 Fed. 262, 127 C. C. A. 80; The Merchant Prince, L. R. 1892 Probate Div. 179; Bradley v. Sullivan (C. C. A. 6) 209 Fed. 833, 835, 126 C. C. A. 557; Hawgood v. Meaford (C. C. A. 6, May 10, 1916) 232 Fed. 564, —— C. C. A. ——.

We have no difficulty in distinguishing this case from The Olympia (C. C. A. 6) 61 Fed. 120, 9 C. C. A. 393. There no theory of explanation was or could be suggested, excepting that the rudder cable had broken. Not only was there no evidence that any defect had been observed, but it was proved that regular inspection had demonstrated that there was no visible trouble. It necessarily followed that the defect must have been of that latent character which could not have been discovered, and hence that the resulting accident was to be classed as inevitable. In the present case, if the trouble was caused by fouling the cable—and there is no compelling reason for discarding that theory—the ship was clearly at fault in the stowing of the cargo or in caring for it during the voyage; and if the trouble was in the steering engine, the ship had notice within the previous hour that something was wrong with the engine, but paid no attention. If there was a duty to be provided with alternative steering gear which could be used quickly, the case is even clearer. So it is apparent that there are clear distinctions between the facts of this case and those of the Olympia.

We infer from the briefs that it is not necessary to decide whether the Bethlehem's fault should be definitely attributed to one or another of these causes, or whether any one constitutes unseaworthiness rather than negligence; if counsel think otherwise, we will consider an application to that effect.

[2] We are clear that the up-bound boats were also in fault, but we are not able to regard that fault as so extreme as to constitute the sole proximate cause of the collision (assuming that the rule of sole proximate cause, or last clear chance, applies in admiralty as at common law). The extent of this fault depends primarily upon the distance between the boats when the Australia, with proper attention, should have realized that the Bethlehem was out of control. Some confusion as to this distance is caused by an uncertainty as to the place intended by the witnesses when they speak of Recor's Point. The river is here making a bend, and the apex of the bend—the point

—where boats would naturally change their course, and where the official chart indicates a change in course, is at a spot marked as Rankin's Dock. About 2,000 feet down stream—on the side of the point —is Recor's Dock, and here is situated a station on the electric railroad running along the bank, which station is named Recor's Point. The evidence of the witnesses, when they speak of Recor's Point, not only indicates quite strongly that they meant the point of land or the apex of the bend which mariners would naturally have in mind, but in 'the only instance where the question was raised it was made clear by both counsel and witness distinctly saying that "Recor's Point" meant "Rankin's Dock." The distance between the boats must, therefore, be made some 2,000 feet less than if it were supposed the witnesses referred to the little station on the railroad.

We conclude that the boats were about one mile apart, when they exchanged port to port meeting signals. There was a 2-mile current and the Bethlehem was making 14 miles and the Australia 7 miles each past the land. They were, therefore, due to meet in about 3 minutes. The Bethlehem was close to the American shore on her starboard, and though the Australia claims to have been in midstream, we are satisfied she was well toward the American shore, keeping towards the shorter line, on the inside of the curve, as she had a perfect right to do. As soon as the Bethlehem's rudder failed to respond, she blew an alarm, and shortly afterwards a second alarm. It was not until after this second alarm that she began noticeably to sheer towards the center of the stream. It is conceded that a boat which takes a sudden sheer usually quickly recovers and straightens up. About this time, the Australia, either swinging to starboard under the agreement or making out from the American shore because of continuing her straight course past the bend, was approximately in the middle of the channel. Her captain, if he had noticed the sheer of the Bethlehem as soon as it should have been clearly apparent to him, could not be bound on the very instant to appreciate that it would continue and bring the Bethlehem away out to the middle of the river. The alarm signal, even when repeated, did not mean that the boat could not be steered. It might mean that the power was gone or any one of several other things. The only sure meaning to the Australia of the first alarm was, "Look Out! something is wrong."

A detailed discussion of testimony is not worth while, but making all allowances for loss of speed of the Bethlehem, due to backing and changing of course, we cannot escape the conclusions that at the time when the captain of the Australia, if he had been observing with care, should be held to know that the Bethlehem was out of control and likely to cross over into his course, and so bound to shape his conduct accordingly, the vessels were rather less than half a mile apart, and that not more than about two minutes intervened between that time and the collision.

Cases are cited to the effect that, when two boats are approaching and one blows an alarm, it is the duty of the other to stop; but these are cases of unincumbered boats meeting in open water. There can

be no such hard and fast duty upon the master of a steamer incumbered with a tow and going against a current in a curving channel. If the Australia had been enabled, by backing and with the aid of the current, to stop sharp, the Polynesia would perhaps have run into her; or if the tow line had been cast off, the Polynesia would quickly drift ashore; or, if the Polynesia had avoided this danger by anchoring, she might have been exactly in the path of the approaching, rudderless boat. Neither, if the captain of the Australia had known exactly what was the matter, could he have been certain how to make his boat safe. The Bethlehem might come across at any angle. As it turns out, if the Australia had been only one length further down stream, there would have been no collision; but this was pure chance. As it turns out, also, the very safest thing for the Australia to do would have been to get over to the American shore as sharply as possible; but this would have been crossing the regular course of the other boat, and, if it had resulted in collision, the Australia would have been surely condemned.

Looking at the situation as far as possible as it then should have appeared to a careful navigator of the Australia, we think due care required that, as soon as the Bethlehem's second alarm was blown, the Australia should have checked as much as could be done without getting into trouble with the tow, and should have given notice to the barge to be ready for any emergency, and then, as soon as the course of the coming sheer could be judged (see The Ohio [C. C. A. 6] 91 Fed. 547, 558, 33 C. C. A. 667), should have gone over as sharply and as rapidly as possible toward the Canadian shore, and directed the tow accordingly. These two movements not only would have avoided the collision which did take place, but they would have been the things most likely to avoid whatever shape the developing danger might take. These considerations convince us that the Australia was at fault, but not in such degree as to make it proper to exonerate the Bethlehem from the damages.

We have assumed that if the navigators of the Australia had been vigilant, but had made the mistake of continuing on their course as long as they did and in checking as little as they did, this contributing fault, and this only, should be imputed. It cannot make the case of the Australia any worse that her officers were not in fact vigilant, and very likely did not appreciate the danger nearly as soon as they should have done so. If arbitrarily applying to the boat the true and proper standard of vigilance does not make her solely responsible for the collision, it cannot be material, on that issue, whether she in fact fell short of that standard much or little.

Rule 26 of the White Law (Act Feb. 8, 1895, c. 64, § 1, 28 Stat. 645, 649 [Comp. St. 1913, § 7936]) pertains to a case where a meeting agreement is in doubt. It puts no burden on the Australia beyond the one we have applied.

The Polynesia was also in fault for the second collision. The tow line was 700 feet long, and even after the collision between the two other boats had become unavoidable, there was, seemingly, ample time

for the Polynesia to cast off the tow line, and either to anchor or to swing to one side or the other of the two boats ahead. At any rate, the negligence of the Polynesia's captain in not promptly trying to do anything will not justify speculation as to whether he might have been hit if he had attempted to pass on either side, or might have failed if he had tried to anchor. Neither as to the Australia nor the Polynesia is a situation presented where a navigator was reasonably vigilant in apprehending danger and in trying to avoid it, and where he merely chose in an emergency what turned out to be the wrong expedient.

The damages should be divided, with due regard to the more or less separable faults involved. We think the conclusions we have stated will enable the court below to enter the proper decree. If not, and if any further question ought to be decided by us on this record, counsel may call it to our attention within the time allowed for a rehearing application. The Australia and Polynesia will recover against the Bethlehem the costs of their appeal; the cargo will recover against all the boats its costs of its appeal.