## COLONIAL NAV. CO. v. UNITED STATES.

(District Court, E. D. New York.    June 16, 1926.)

No. 6899.

**1. Collision ⚖══22.**

In libel for damages from collision of submarine with steamship, due to failure of electric steering gear of submarine to properly function, defense of inevitable accident *held* not sustained by government.

**2. Collision ⚖══125.**

In libel for damages from collision respondent, to sustain defense of inevitable accident, must point out precise cause, or show all possible causes, and that it was not negligent as to precise cause, or any of possible causes.

In Admiralty.    Libel by the Colonial Navigation Company against the United States.    Decree for libelant.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark and Frederic Conger, both of New York City, of counsel), for libelant.

William A. DeGroot, U. S. Atty., of Brooklyn, N. Y. (Charles E. Wythe, of New York City, of counsel), for the United States.

CAMPBELL, District Judge.    This is a suit brought by the libelant under an act of Congress approved by the President on or about June 3, 1924 (Private No. 35, 68th Congress [43 Stat. 1369]), which, in so far as it is necessary for consideration, provides as follows:

"That the claim of Colonial Navigation Company, owner of the American steamship Lexington, against the United States for damages alleged to have been caused by collision between said vessel and the United States submarine O-7 on the 6th day of October, 1919, in the East River, New York, near Horns Hook, may be sued for by the owner of the said American steamship Lexington in the United States District Court for the Eastern District of New York, sitting as a court of admiralty, and acting under the rules governing such court, and said court shall have jurisdiction to hear and determine such suit and to enter judgment or decree for the amount of such damages, including interest, and costs, if any, as shall be found to be due against the United States in favor of the owner of the said American steamship Lexington, or against the owner of the said American steamship Lexington in favor of the United States, upon the same principles and measures of liability as in like cases in admiralty between private parties, and with the same rights of appeal: Provided, that such notice of the suit shall be given to the Attorney General of the United States as may be provided by order of the said court, and it shall be the duty of the Attorney General to cause the United States attorney in such district to appear and defend for the United States: Provided further, that said suit shall be brought and commenced within four months of the date of the passage of this act."

On stipulation, the testimony of George B. Junkin, F. Gleason, A. Laughlin, W. E. Kelly, Foster Gray, and Clarke Withers, at a board of investigation convened at the Navy Yard, New York, on October 6 and 7, 1919, was considered as depositions taken on behalf of respondent in this suit, and might be read in evidence by either party, and was read as evidence on behalf of the respondent. The master and pilot of the steamship Lexington were called on behalf of the libelant.

On the afternoon of October 6, 1919, the Lexington, 250 feet long, 55 feet beam, carrying passengers and cargo, left her berth at Pier 39, North River, Manhattan, bound for Providence, R. I., rounded the Battery, and proceeded up the East River between Blackwell's Island and the Manhattan shore. The weather was clear, wind light northwest, and tide flood. The master was in the pilot house in charge, with the first and second pilots and quartermasters, and a lookout was stationed forward.

At about 6:10 o'clock p. m.; when the Lexington was about off Eightieth street, she blew the usual long bend whistle approaching Horn's Hook, and received an answering signal from a vessel behind Hallets Point, whereupon she immediately stopped her engines and was drifting with the tide. The Lexington was on her starboard side of the channel.

The submarine U. S. S. O-7, from New London, Conn., to Ninety-Sixth street, North River, New York, was just making the turn at Hallets Point, when the Lexington blew the bend whistle, and was well on the Lexington's port bow. The Lexington continued to drift with the tide, and when about off Ninety-Second street, East River, the electric steering gear jammed and the O-7 suddenly made a sharp sheer to port, and when about 250 yards distant from the Lexington blew the alarm whistle, stopped both engines, threw in hand steering gear, and backed on both motors. The Lexington immediately reversed her engines full speed astern, put her helm hard-aport, and answered the alarm.

The O-7 struck the Lexington on her port bow, about 5 feet aft of the stem, and caused considerable damage. At the time of the

collision the Lexington was practically dead in the water, but passing over the bottom with the strength of the tide, 3 to 3½ knots an hour.

About two minutes elapsed from the time the submarine blew the danger signal until the collision occurred. The force of the collision turned both vessels towards the Astoria shore, and as soon as the Lexington was clear of the O-7 she stopped backing, and came ahead with a hard-aport wheel, and landed at the dock at Marine Stores, Astoria, about 500 to 600 feet from the place of collision.

There seems to be no dispute as to the facts already found. The master and pilot of the Lexington testified before me, and I find that, after the Lexington had landed at Astoria, the O-7 again struck the Lexington a heavy blow on her port quarter, after which the O-7 was picked up by a lighter and landed right ahead of the Lexington.

No mention of the O-7 striking the Lexington a second time was made in any of the testimony given before the board of investigation, but the O-7 was clearly identified on the trial by the pilot of the Lexington, who testified to seeing the O-7 turn around parallel to the Lexington and the stern of the O-7 strike the stern of the Lexington. The Lexington suffered damage both of the times she was struck by the O-7.

[1] That the collision was due to the failure of the steering gear of the O-7 to function properly is admitted, and it is conceded that the Lexington made every effort to avoid the collision. The only question, therefore, which is raised, is whether the accident was inevitable, as contended by the government in its answer.

The government contends that the failure of the steering gear of the O-7 to function properly was caused by the fusing of a contactor in the electric telemotor system, which prevented the operation of the gear when the controller was put on the right rudder. It further contends that the fusing of the contactor was due to a latent defect, which was not discoverable by a reasonable and careful inspection, and that the contactor was of standard make and quality, and of the kind ordinarily used for the purpose, and previous to the accident had been regularly and carefully inspected.

[2] To sustain inevitable accident as a defense, the government must either point out the precise cause, and show that it was not negligent in connection with it, or it must show all possible causes, and that it was not in fault in connection with any one of them. In re Reichert Towing Line, 251 F. 214, 217,

163 C. C. A. 370. The government says that the cause of the collision was the failure of the steering gear to function, because of the jamming of the rudder, which was due to the dynamic break contact fusing and sticking.

But, if we accept that as the cause of the collision, then the accident was not inevitable, because this was not a new trouble, but, as the commander of the O-7 testified, several times previous this same trouble with the steering gear had occurred, and had been reported to the construction and repair department for the last two quarters; but he had had the contactor panel overhauled and put in excellent condition previous to starting on this trip, and no casualty had occurred in the contactor panel on this trip until the time of the collision.

No inspection of the contactor panel of the steering gear was made during the trip, notwithstanding the fact of its well-known dangerous condition, and that the O-7 was navigating through the most dangerous channel in New York Harbor and vicinity. There was an inherent fault in the type of clapper contact, and accidents like that in the instant suit will occur; overhauling will only reduce the danger, but the danger of reoccurring of the same trouble exists after overhauling, as was shown by the testimony taken on the investigation.

The examination and overhauling of the contactor panel before leaving New London was not, in my opinion, sufficient to relieve the government from the charge of negligence, as there were the following precautions which should have been taken by the vessel: The use of the engines, which could not be reversed, should have been discontinued before reaching Hell Gate, and the motors should have been used passing through Hell Gate and the crowded traffic of New York Harbor, and the hand steering gear, instead of the electric steering apparatus, should have been used going through the Gate.

The excuse for not using the motor, made by the government's witness, that sufficient speed could not be obtained with electric motors without using up all the current in the battery, does not relieve the government from the charge of negligence. Likewise the excuse offered by a government witness for not using the hand steering gear while passing through Hell Gate and entering New York Harbor, that hand steering is slow of action and quick rudder angles are needed, and that the hand steering gear was below, and the steersman was wanted on the bridge, does not relieve the government from the charge of negligence, because there was no apparent

reason for speed when the possibility of danger was so well known. All that would have been necessary would have been to reduce the speed, and, with the number of officers on the bridge, there would have been no great difficulty in maintaining a proper lookout and transmitting orders to the steersman.

That danger from the electric steering gear was considered at least not unlikely appears from the precautions taken by the commander of the O–7, before entering Hell Gate, as appears by his testimony; but the results show that all that could be accomplished thereby would be to reduce the injury inflicted, not to avoid it, whereas all danger from the defective steering gear, while passing through Hell Gate and New York Harbor, could have been avoided, and the accident prevented, by using the hand steering gear or the motors, instead of the engines. .

The defense of inevitable accident has not been sustained. The Merchant Prince, 1892 Prob. Div. 179, Asp. Mar. Cas. Vol. 7, N. S. p. 208; The Lackawanna, 210 F. 262, 127 C. C. A. 80; Australia Transit Co. v. Lehigh Valley Transp. Co. (C. C. A.) 235 F. 53; The City of Camden (C. C. A.) 292 F. 93; The Edmund Moran, 180 F. 700, 104 C. C. A. 552; The Enterprise (D. C.) 228 F. 131; The J. Rich Steers, 228 F. 319, 142 C. C. A. 611; Hawgood & Avery Transit Co. v. Meaford Transp. Co., 232 F. 564, 146 C. C. A. 522. The O–7 is solely responsible for the resulting damage. The libelant in this case is entitled to interest under the terms of the Enabling Act.

A decree may be entered in favor of the libelant against the United States, the respondent, for damages, including interest and costs, and, unless the same are stipulated, with the usual order of reference.